**WHEELING CORPORATION, Appellant and Cross–Appellee,**

v.

**COLUMBUS & OHIO RIVER RAILROAD COMPANY
et al., Appellees and Cross–Appellants.***

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 00AP–1224.

Decided Dec. 20, 2001.

---

* Reporter's Note: An appeal to the Supreme Court of Ohio was not allowed in 95 Ohio St.3d 1436, 2002-Ohio-2084, 766 N.E.2d 1002.

462

Zeiger & Carpenter, John W. Zeiger and Steven W. Tigges; Taft, Stettinius & Hollister, LLP, Stephen M. O'Bryan and Peter M. Poulos, for appellant.

Chester, Willcox & Saxbe, LLP, Stephen C. Fitch and David J. Butler, for appellee Columbus & Ohio River Railroad Company.

Roetzel & Andress, Stephen D. Jones and Nadine Hauptman, for appellee Ohio Rail Development Commission.

Betty D. Montgomery, Attorney General, and Alan H. Klodell, Assistant Attorney General, for appellee Ohio Rail Development Commission.

DESHLER, Judge.

{¶ 1} On June 30, 1997, the Wheeling Corporation ("Wheeling") filed a complaint in the Franklin County Court of Common Pleas against Columbus & Ohio River Railroad Company ("C&OR") and the Ohio Rail Development Commission ("ORDC"). Count one sought a declaration as to Wheeling's rights under a request for proposals ("RFP") issued by ORDC on February 20, 1997. Under the RFP, ORDC sought a rail operator for the Panhandle Rail Line ("Panhandle line") running between Columbus and Mingo Junction, Ohio. The state of Ohio had acquired the line from Consolidated Rail Corporation in April 1992, and ORDC is the lessee of the line. At the time of the RFP, C&OR was the existing

contract operator/common carrier on the Panhandle line under an operating agreement that was set to expire on April 16, 1997. ORDC issued the RFP, establishing a competitive selection process, in order to determine the best qualified operator and to enter into an operating agreement with the selected rail operator.

{¶ 2} The proposal process was to consist of two phases. The RFP set forth a 700-point evaluation procedure to be used in both phases. The RFP called for a "Selection Committee" that would evaluate and score the proposals. The Selection Committee was to be chosen by ORDC and would consist of commissioners, commission staff, and others whom ORDC deemed suitable to evaluate the proposals. The top two proposers of the first phase would go on to Phase II. The top-ranked proposer in Phase II would be asked by ORDC to enter into an operating agreement, the terms and conditions of which were not fully set forth in the RFP.

{¶ 3} Wheeling and C&OR were chosen as the top two proposers during Phase I, with Wheeling scoring the most points. During Phase II, C&OR was ranked the highest scorer. On May 29, 1997, ORDC passed a resolution selecting C&OR to operate the Panhandle line and authorizing the ORDC staff to enter into a new operating agreement with C&OR, with negotiations to be completed and implemented by June 20, 1997. Such an operating agreement was entered into on June 20, 1997, effective July 1, 1997.

{¶ 4} Wheeling's complaint averred that ORDC failed to follow the selection criteria set forth in the RFP and that, had ORDC followed the RFP, Wheeling would have been selected as the rail operator. As indicated above, Wheeling sought a declaration of its rights under the RFP, including a declaration that the award to C&OR was unlawful and void and that it should be awarded the operating agreement. Wheeling also sought an injunction prohibiting the operating agreement between ORDC and C&OR from taking effect on July 1, 1997, maintaining the status quo between ORDC and C&OR regarding rail service on the Panhandle line, prohibiting ORDC from taking any further actions to award the operating rights to C&OR, and ordering ORDC to award the operating agreement to Wheeling.

{¶ 5} On June 30, 1997, Wheeling sought a temporary restraining order maintaining the then-current operating agreement in effect between ORDC and C&OR and prohibiting the July 1, 1997 operating agreement from taking effect. On July 1, 1997, the trial court denied Wheeling's motion for a temporary restraining order, indicating that such denial would not serve to bar the July 1, 1997 operating agreement from being set aside if the RFP process was found to be flawed.

{¶ 6} On July 7, 1997, Wheeling filed an amended complaint adding a claim for damages incurred as a result of the alleged faulty RFP process and a claim alleging that ORDC and the Selection Committee had violated R.C. 121.22, commonly referred to as the Open Meetings Act ("OMA").[1] Wheeling sought a declaration that the July 1, 1997 operating agreement was invalid and void, pursuant to R.C. 121.22(H), and an injunction compelling ORDC's compliance with the OMA with regard to awarding the operating agreement.

{¶ 7} The parties agreed to bifurcate the OMA claims from the RFP claims. In December 1997, a bench trial was held on the OMA claims. On April 28, 1998, the trial court rendered a decision and judgment entry. The trial court concluded that the Selection Committee was a public body subject to R.C. 121.22 and that the Selection Committee and ORDC had violated the OMA. Therefore, the trial court invalidated the Selection Committee's decision, the ORDC's May 29, 1997 resolution selecting C&OR as the new rail operator, and the July 1, 1997 operating agreement stemming therefrom. The trial court also concluded that Wheeling was entitled to an injunction compelling ORDC's compliance with R.C. 121.22 in awarding the operating agreement. Further, the trial court ordered ORDC to pay Wheeling all court costs and attorney fees upon submission of the appropriate application and affidavit.

{¶ 8} ORDC filed a notice of appeal of the April 28, 1998 judgment. However, this court dismissed the appeal for lack of a final, appealable order.

{¶ 9} In the meantime, Wheeling submitted an application for attorney fees based on the OMA violations. ORDC filed a memorandum contra, arguing that attorney fees should be reduced or denied pursuant to R.C. 121.22(I)(2)(a).

{¶ 10} On March 8, 1999, Wheeling filed a third amended complaint adding a claim against C&OR for damages for intentional interference with business relationships. On this same date, ORDC and C&OR filed motions for summary judgment on counts one, two, and three of Wheeling's second amended complaint. On July 10, 1999, the trial court issued a decision on the summary judgment motions. Summary judgment was awarded to ORDC and C&OR on Wheeling's claim for an injunction awarding the operating agreement to Wheeling. The trial court concluded that it lacked the authority to issue an injunction compelling ORDC to award the operating agreement to Wheeling. In addition, the trial court granted summary judgment in favor of ORDC on Wheeling's claims for damages. The trial court denied ORDC's and C&OR's motions for summary judgment on the claim for an injunction compelling ORDC to re-bid the operating

---

1. Wheeling filed a second amended complaint on December 5, 1997, setting forth an additional OMA claim.

agreement and on the claim seeking to enjoin C&OR from participating in any re-bid.

{¶ 11} On December 15, 1999, C&OR filed a motion for summary judgment on Wheeling's claim for monetary damages. Summary judgment was granted in favor of C&OR as to this claim on February 22, 2000.

{¶ 12} On February 2, 2000, Wheeling filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin ORDC and C&OR from closing or consummating the sale of the Panhandle line to C&OR. On February 4, 2000, the trial court rendered a decision. The trial court refused to issue a preliminary injunction, but it prohibited ORDC and C&OR from selling or otherwise encumbering the ownership of and right to manage the Panhandle line.

{¶ 13} In March 2000, a bench trial was held as to the remaining claims.

{¶ 14} In June 2000, a hearing was conducted on the reasonableness of attorney fees pursuant to the trial court's April 28, 1998 decision on the OMA violations.

{¶ 15} On September 14, 2000, the trial court rendered a decision on the claims stemming from the RFP process. The trial court concluded, among other things, that there was no requirement that ORDC use competitive selection in leasing the Panhandle line, that a public agency was bound to adhere to its RFP, that ORDC and the Selection Committee substantially complied with the RFP, and that ORDC and the Selection Committee acted reasonably and in good faith in scoring Phase I and Phase II responses. Accordingly, the trial court found in favor of ORDC and C&OR on Wheeling's remaining claims.

{¶ 16} On September 18, 2000, the trial court rendered a decision on the issue of attorney fees based on the OMA violations. The trial court declined to award attorney fees on the basis that ORDC and/or the Selection Committee acted in good faith and/or reasonably in holding nonpublic meetings and that the public benefit gained by Wheeling's success on its OMA claims was not significant enough to merit such an award.

{¶ 17} On September 28, 2000, the trial court journalized a final judgment entry. On October 26, 2000, Wheeling filed a notice of appeal with this court. ORDC and C&OR have filed notices of cross-appeal.

{¶ 18} Wheeling has set forth the following errors for our consideration:

{¶ 19} "I. The trial court erred as a matter of law in concluding that ORDC did not abuse its discretion even though ORDC changed the RFP's publicly announced scoring criteria, selectively applied the RFP's rules to the bidders, modified the RFP's non-negotiable bidding requirements for C&OR, and awarded the operating agreement based upon all of these unannounced criteria.

{¶ 20} "II. The trial court erred as a matter of law in concluding that wheeling lacked standing to challenge the ORDC's modification or waiver of the non-negotiable principles and its failure to reject C&OR's bid as it was not in compliance with same.

{¶ 21} "III. The trial court erred as a matter of law when it refused to award any attorney's fees to Wheeling after finding that substantial violations of the Open Meetings Act had been committed by ORDC in awarding the 1997 operating agreement to C&OR."

{¶ 22} The ORDC has assigned the following errors:

{¶ 23} "1. The trial court erred in finding that a temporary advisory selection committee informally established by a state agency to provide a recommendation in a competitive selection process was a public body under R.C. 121.22(B)(1)(b) and therefore subject to the requirements of Ohio's Open Meetings Act.

{¶ 24} "2. The trial court erred in finding the selection committee violated the Open Meetings Act during its meetings on May 3, 1997 [*sic*], May 12, 1997 and May 16, 1997.

{¶ 25} "3. The trial court erred in finding the commission violated R.C. 121.22(G) when it attempted to enter an executive session during its May 29, 1997 meeting.

{¶ 26} "4. The trial court erred in finding the commission violated R.C. 122.22(G) because it deliberated over the Panhandle selection process, Resolution 97–13, and the operating agreement without properly specifying a statutorily allowed reason to discuss those subjects.

{¶ 27} "5. The trial court erred in finding that Resolution 97–13 and the related operating agreement were invalid under the Open Meetings Act because of the conduct of the selection committee and the commission, entitling appellant to an injunction and civil forfeiture pursuant to R.C. 121.22.

{¶ 28} "6. The trial court erred in finding that appellant did not waive its claims under the Open Meetings Act."

{¶ 29} C&OR sets forth the following assignments of error:

{¶ 30} "1. The trial court erred in its conclusion of law that Wheeling did not waive its claims under the Ohio Open Meetings Act.

{¶ 31} "2. The trial court erred in its implicit conclusion of law that Wheeling was not estopped to assert its Open Meetings Act claims."

{¶ 32} We address ORDC's and C&OR's cross-appeals first. For the sake of convenience, in discussing the cross-appeals, ORDC and C&OR will collectively

be referred to as "appellees," and Wheeling will be referred to as "appellant." Appellees' cross-appeals address the trial court's judgment in favor of appellant on its claims relating to R.C. 121.22, commonly referred to as the OMA. As indicated above, the trial court found both ORDC and the Selection Committee had violated certain provisions of the OMA. The trial court invalidated the resolution that had awarded the operating agreement to C&OR and issued an injunction compelling ORDC to comply with R.C. 121.22 in awarding the operating agreement. Appellees have filed separate appeals from this judgment.

{¶ 33} In its first cross-assignment of error, ORDC contends that the trial court erred in concluding that the Selection Committee was a public body under R.C. 121.22(B)(1)(b) and was subject to the OMA. R.C. 121.22(B), in effect at the pertinent time, stated[2]:

{¶ 34} "(B) As used in this section:

{¶ 35} "(1) 'Public body' means either of the following:

{¶ 36} "(a) *Any* board, commission, *committee*, council, or similar decision-making body *of a state agency*, institution, or authority * * *;

{¶ 37} "(b) Any committee or subcommittee of a body described in division (B)(1)(a) of this section. * * *

{¶ 38} "(2) 'Meeting' means any prearranged discussion of the public business of the public body by a majority of its members.

{¶ 39} "* * *

{¶ 40} "(C) All meetings of any public body are declared to be public meetings open to the public at all times. * * *" (Emphasis added.)

{¶ 41} ORDC, which is a state agency, contends that the Selection Committee was not a public body because the Selection Committee was established on a temporary basis, solely for the limited purpose of evaluating and scoring proposals, was merely an advisory group that made a recommendation to the full ORDC, and had no decision-making authority. In its April 28, 1998 decision, the trial court found:

{¶ 42} "10. In order to assist in the selection process, a special Selection Committee was appointed by ORDC's Chairman, James Betts.

{¶ 43} "* * *

{¶ 44} "12. The Selection Committee was comprised of a total of five members, three of whom were currently serving as Commissioners of the ORDC. The

---

2. The current version of R.C. 121.22 is substantially the same as the version quoted above.

remainder of those selected were chosen primarily because of their knowledge and experience in the railroad industry.

{¶ 45} "* * *

{¶ 46} "15. The Selection Committee's role was to review and evaluate proposals and to make a recommendation to the ORDC as to which proposer should be awarded the Operating Agreement for the Panhandle rail line.

{¶ 47} "* * *

{¶ 48} "17. During its three private meetings, the Selection Committee made decisions in evaluating and scoring the proposals submitted in response to the RFP and made decisions to amend and change the terms of the RFP.

{¶ 49} "18. During its three private meetings, the Selection Committee changed the scoring rules which had been publicly announced in the RFP.

{¶ 50} "* * *

{¶ 51} "20. The Selection Committee deliberated over the proposals during its meetings held on April 3, 1997, May 12, 1997 and May 16, 1997.

{¶ 52} "* * *

{¶ 53} "31. The Selection Committee reached its decision that C&OR should be given the right to negotiate for the new Panhandle Operating Agreement during the telephone conference call held on May 16, 1997.

{¶ 54} "32. As soon as the Selection Committee made its decision on May 16, 1997, it notified the ORDC's staff which immediately began negotiating the new Panhandle Operating Agreement with C&OR."

{¶ 55} ORDC, in essence, does not dispute the above findings. Instead, ORDC finds fault with the trial court's conclusion based on these facts. For the reasons that follow, we find that the trial court did not err in concluding that the Selection Committee was a public body under R.C. 121.22(B)(1).

{¶ 56} We note first that R.C. 121.22(A) states:

{¶ 57} "This section shall be liberally construed to require public officials to take official action and to conduct all deliberations upon official business only in open meetings, unless the subject matter is specifically excepted by law."

{¶ 58} In Thomas v. White (1992), 85 Ohio App.3d 410, 411, 620 N.E.2d 85, the court of appeals dealt with an appeal from a trial court's determination that a citizens' advisory committee of a county children services board was not a public body. The court of appeals concluded that the committee was a public body. The board had argued that the committee was not a public body because it was not a decision-making body. Id. The court of appeals stated that a strict reading of R.C. 121.22(B) indicated that a committee need not be a decision-making body

in order to be a public body. Id. at 412, 620 N.E.2d 85. The court of appeals stated that, even if the statute required that a committee be a decision-making body, the committee at issue was such a body. Id. For example, the committee made recommendations to the board, and its enabling statute called for the committee to advise the board on policies. Id. Such tasks involved decision-making. Id. Further, the subject matter of the committee's operations was the public business of the board, and each of the committee's duties involved decisions as to what would be done. Id.

{¶ 59} In *The Cincinnati Enquirer v. Cincinnati* (2001), 145 Ohio App.3d 335, 762 N.E.2d 1057, the court of appeals reviewed the trial court's decision that an urban design review board, a group of architectural consultants for the city, was a public body under R.C. 121.22. The board consisted of four architects and a chairperson, and its purpose was to review all new construction projects in the Cincinnati business district and to make recommendations to and generally advise the Cincinnati city manager on acceptability of development plans.

{¶ 60} The city argued that the board was merely advising the city manager and had no decision-making authority that could bind the city. The court of appeals stated that such may be the case; however, the board still made decisions. Citing *Thomas,* the court of appeals stated that whether the board had the ultimate authority to decide matters was not controlling; the board actually made decisions in the process of formulating its advice. The city argued that the board merely advised the city manager and not a public body. The court of appeals noted that the board did advise city council, which was a public body.

{¶ 61} The court of appeals concluded that under a liberal definition of public body, the board was a public body. It was a decision-making board that reported its decisions to the city manager and city council. Therefore, all of its meetings had to be public.

{¶ 62} In the case at bar, the Selection Committee was, obviously, called a committee, and R.C. 121.22(B) specifically includes committees under the definition of public body. A majority of the Selection Committee's members were commissioners of the commission itself. There is no question that, like the bodies in *Thomas* and *The Cincinnati Enquirer,* the Selection Committee made decisions and then advised ORDC. The fact that the Selection Committee was established by the committee without formal action is immaterial. If we accepted this argument, ORDC could informally establish committees all the time, and such committees would not be subject to the OMA. This is not the intent of the OMA.

{¶ 63} Given all of the above, the trial court did not err in concluding that the Selection Committee was a public body under R.C. 121.22(B) and, therefore,

subject to the OMA. Accordingly, ORDC's first cross-assignment of error is overruled.

{¶ 64} In its second cross-assignment of error, the ORDC contends that the trial court erred in finding that the Selection Committee violated the OMA in conducting closed meetings on April 3, 1997, May 12, 1997, and May 16, 1997. The trial court found that the Selection Committee deliberated over the proposals during these three meetings, that no notice of such meetings was given, that such meetings were not open to the public, and that no motion or roll call vote to convene into executive session was taken during such meetings. ORDC argues that the Selection Committee meetings were properly closed to the public because the Selection Committee was not a public body and could take no formal action, the information contained in the proposals and related documents was confidential, and the scoring sessions were not "meetings" under R.C. 121.22(B)(2).

{¶ 65} First, we have already determined that the Selection Committee was a public body subject the OMA. Further, there is no dispute that a majority of its members were present at the three, prearranged meetings. See R.C. 121.22(B)(2).[3] Therefore, the Selection Committee was subject to the requirement that such meetings be open to the public. Further, any action it took at such meetings, such as the scoring of the proposals which resulted in C&OR becoming the winning proposer, can be held invalid under R.C. 121.22(H).

{¶ 66} As to the confidentiality aspect of what was discussed in such meetings, even if we accepted ORDC's assertion that *all* of the matters discussed were confidential under R.C. 121.22(G), which we do not, there is no dispute that the Selection Committee did not follow the requirements for holding an executive session. R.C. 121.22(G) states, in part, that the members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session. This was not done in the case at bar. For this reason alone, the trial court did not err in concluding that the Selection Committee violated the OMA.

{¶ 67} Accordingly, ORDC's second cross-assignment of error is overruled.

{¶ 68} We will address ORDC's third, fourth, and fifth cross-assignments of error together. ORDC contends that the trial court erred in finding that it violated R.C. 121.22(G) in attempting to enter an executive session during its May 29, 1997 meeting and that it violated R.C. 121.22(G) in failing to specify the statutorily allowed reason for entering executive session. Further, ORDC

---

3. As indicated previously, R.C. 121.22(B)(2) defines a meeting as any prearranged discussion of the public business of the public body by a majority of its members.

asserts that the trial court erred in invalidating Resolution 97–13 and the 1997 Operating Agreement, in granting an injunction and in fining the commission $500 based on violations of the OMA.

{¶ 69} ORDC argues that it properly convened an executive session under R.C. 121.22(G). R.C. 121.22(G) states:

{¶ 70} "* * * [T]he members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session and only at a regular or special meeting for the sole purpose of the consideration of any of the following matters:

{¶ 71} "* * *

{¶ 72} "(5) Matters required to be kept confidential by federal law or rules or state statutes[.]

{¶ 73} "* * *

{¶ 74} "If a public body holds an executive session to consider any of the matters listed in divisions (G)(2) to (6) of this section, the motion and vote to hold that executive session shall state which one or more of the approved matters listed in those divisions are to be considered at the executive session."

{¶ 75} The trial court found:

{¶ 76} "34. During its meeting of May 29, 1997, Chairman Betts announced ORDC would enter an executive session to discuss 'litigation' and 'personnel' issues.

{¶ 77} "35. The draft notes made concomitant with the meeting of May 29th and used to prepare the official minutes of that meeting neither reflect a motion was made and seconded to go into executive session; nor that a roll call vote was taken to go into executive session; nor do the minutes indicate for what purpose an executive session was to be held.

{¶ 78} "36. The official minutes of the May 29th meeting do not indicate that a motion was made and seconded and a roll call vote taken to go into executive session, but they do indicate the executive session was needed to discuss 'litigation' and 'personnel' issues.

{¶ 79} "37. The official minutes of the May 29th [meeting] were approved without additions or corrections at the next regular meeting of the ORDC."

{¶ 80} The trial court then concluded:

{¶ 81} "7. ORDC violated R.C. 121.22(G) when it attempted to enter an executive session during its May 29, 1997 meeting without a proper motion and without holding a roll call vote of a majority of a quorum.

{¶ 82} "8. ORDC violated R.C. 12[1].22(G) when it deliberated over the Panhandle selection process, Resolution 97–13, and Operating Agreement without properly specifying a statutorily allowed reason for convening privately to discuss those subjects."

{¶ 83} ORDC asserts that as to the minutes of the May 29, 1997 meeting, such minutes were incomplete, and the trial court erroneously refused to consider evidence that a motion and roll call vote did indeed occur prior to the executive session, despite the omission of such from the minutes.

{¶ 84} First, we acknowledge that there was evidence that, notwithstanding the lack of such in the minutes, a motion and roll call vote did occur at the May 29, 1997 meeting. However, we need not address this factual issue. There is no dispute that, even if such motion and vote took place, there was no statement concerning which of the approved matters listed in R.C. 121.22(G)(2) through (6) was to be considered at the executive session. As indicated above, the minutes state that the purpose of adjourning to executive session was to discuss litigation and personnel issues. ORDC concedes that the minutes do not mention that a purpose of the executive session was to discuss the operating agreement. Further, there is no evidence that a purpose of the executive session was to discuss confidential matters.

{¶ 85} ORDC asserts that all of the commissioners present at the May 29, 1997 meeting had been mailed the executive session agenda prior to the meeting and were aware that the operating agreement would be discussed. This fact is immaterial to the requirement in R.C. 121.22(G) that the excepted matter be stated in the motion and vote. Because ORDC failed to specify on the record which excepted subject was to be considered during executive session, a violation of the OMA occurred. See *State ex rel. Fenley v. Kyger* (1995), 72 Ohio St.3d 164, 166, 648 N.E.2d 493, fn. 1. *Vermilion Teachers' Assn. v. Vermilion Local School Dist. Bd. of Edn.* (1994), 98 Ohio App.3d 524, 648 N.E.2d 1384, discretionary appeal not allowed (1995), 71 Ohio St.3d 1502, 646 N.E.2d 1126.

{¶ 86} ORDC also asserts that no violation of the OMA occurred because deliberations on the operating agreement did not occur during the executive session. However, there was evidence that the operating agreement was discussed at length during the executive session, including whether C&OR was the best qualified. See *Springfield Local School Dist. Bd. of Edn. v. Ohio Assn. of Pub. School Emp., Local 530* (1995), 106 Ohio App.3d 855, 863–866, 667 N.E.2d 458. In addition, the resolution that was adopted immediately subsequent to the executive session in an open session had been revised during the executive session. Clearly, the resolution resulted from the deliberations occurring in executive session and/or in private meetings. See *State ex rel. Delph v. Barr* (1989), 44 Ohio St.3d 77, 81, 541 N.E.2d 59.

{¶ 87} ORDC further asserts that, even if there were deliberations over the operating agreement and resolution during executive session, such deliberations fell under the exception contained in R.C. 121.22(G)(5). However, even if we were to accept this as true (which we do not necessarily accept), there still exists a violation of the OMA. R.C. 121.22(H) states:

{¶ 88} "* * * A resolution, rule, or formal action adopted in an open meeting that results from deliberations in a meeting not open to the public is invalid unless the deliberations were for a purpose specifically authorized in division (G) * * * of this section *and conducted at an executive session held in compliance with this section. * * *"* (Emphasis added.)

{¶ 89} Here, the resolution was the result of deliberations conducted not only in the May 29, 1997 executive session (which we have already determined was held in violation of the OMA for the failure, at the very least, to specifically state the excepted purpose of the executive session) but, also, was the result of the three prior meetings conducted by the Selection Committee and which we have determined were not in compliance with the OMA. Therefore, the trial court properly invalidated the resolution and related operating agreement pursuant to R.C. 121.22(H).

 {¶ 90} ORDC argues that even if there was a technical violation of the OMA, it "cured" any such violation by conducting an open meeting following the May 29, 1997 executive session and prior to taking formal action. However, there was more than a mere "technical" violation. At the very least, it was shown that the Selection Committee had three private meetings wherein it was determined that C&OR had the most points and that these meetings affected the final, formal resolution granting the operating agreement to C&OR. There can be no cure for these violations, and R.C. 121.22(H) still applies to invalidate the formal action taken at the May 29, 1997 meeting. See *Gannett Satellite Info. Network, Inc. v. Chillicothe Bd. of Edn.* (1988), 41 Ohio App.3d 218, 221, 534 N.E.2d 1239, motion to certify overruled (1988), 38 Ohio St.3d 710, 533 N.E.2d 363 (a violation of the OMA cannot be cured by subsequent open meetings if the public body initially discussed matters in executive session that should have been discussed before the public).

{¶ 91} Finally, we reject ORDC's contention that invalidation of the resolution is not warranted because appellant cannot show prejudice. First, we have established that R.C. 121.22 has been violated. Under R.C. 121.22(I)(3), prejudice is presumed.[4] See, also, *State ex rel. Stiller v. Columbiana Exempted*

---

4. R.C. 121.22(I)(3) states that irreparable harm and prejudice to the party that sought the injunction shall be conclusively and irrebutably presumed upon proof of a violation or threatened violation of this section.

*Village School Dist. Bd. of Edn.* (1995), 74 Ohio St.3d 113, 119–120, 656 N.E.2d 679; *State ex rel. Mason v. State Emp. Relations Bd.* (1999), 133 Ohio App.3d 213, 216–218, 727 N.E.2d 181.

{¶ 92} For all of the foregoing reasons, we conclude that the trial court did not err in finding that the ORDC/Selection Committee violated R.C. 121.22 and in invalidating Resolution 97–13 and the related operating agreement pursuant to R.C. 121.22(H). Accordingly, ORDC's third, fourth, and fifth cross-assignments of error are overruled.

■ {¶ 93} In ORDC's sixth cross-assignment of error and in C&OR's first cross-assignment of error, appellees assert that the trial court erred in finding that appellant had not waived its OMA claims. Appellees contend that appellant is not entitled to injunctive relief because it willingly and actively participated in the selection process without objection, including participating in the May 12, 1997 meeting. Appellant contends that it did not voluntarily relinquish a known right with full knowledge of the facts and that there is no evidence it knew that ORDC and the Selection Committee were violating the OMA.

{¶ 94} We note first that the portion of the May 12, 1997 meeting which appellant attended arguably would not be considered a "meeting" under the OMA but, instead, merely constituted information-gathering between public officials and a nonpublic official. See *Springfield Local School Dist. Bd. of Edn.,* supra, at 864, 667 N.E.2d 458. However, once the Selection Committee discussed and scored the proposals among only its members, the meeting became subject to R.C. 121.22.

■ {¶ 95} As to the waiver issue, waiver has been defined as a voluntary relinquishment of a known right, with the intent to do so with full knowledge of all the facts. *N. Olmsted v. Eliza Jennings, Inc.* (1993), 91 Ohio App.3d 173, 180, 631 N.E.2d 1130. The party seeking to prove the waiver must do so by showing a clear, unequivocal, decisive act by the other party of such a purpose it acts an estoppel on that party's part. Id. See, also, *Griffith v. Linton* (1998), 130 Ohio App.3d 746, 751, 721 N.E.2d 146. No such proof has been shown in the case at bar. Appellant did participate in the process before the Selection Committee; however, there is simply no evidence that appellant was aware of OMA violations, let alone assenting to such.

{¶ 96} Appellees cite cases wherein courts have applied the waiver doctrine to OMA claims. See *Jones v. Brookfield Twp. Trustees* (June 30, 1995), Trumbull App. No. 92–T–4692, 1995 WL 411842, discretionary appeal not allowed (1995), 74 Ohio St.3d 1477, 657 N.E.2d 784; *Brownfield v. Warren Local School Dist. Bd. of Edn.* (Aug. 28, 1990), Washington App. No. 89 CA 26, jurisdictional motion overruled (1991), 57 Ohio St.3d 711, 568 N.E.2d 697; *Myers v. Waverly City*

*School Dist. Bd. of Edn.* (July 12, 1985), Pike App. No. 380, 1985 WL 9388; and *Shie v. Hamilton City School Dist. Bd. of Edn.* (Oct. 10, 1981), Butler App. No. 79–04–0041, 1981 WL 5217. However, even if we assume that waiver principles apply to OMA claims, the cases cited by appellees are distinguishable and/or not on point.

{¶ 97} For example, in *Myers* there is no analysis of the waiver finding, and the decision does not discuss the facts as to what the alleged R.C. 121.22 violation was. Accordingly, this fifteen-year-old unpublished decision will not be cited by this court as precedent for applying general waiver principles to OMA claims.

{¶ 98} In *Shie*, the issue was the failure of the complaining party to raise procedural defects before the original tribunal. Here, there was no legal proceeding in which to object prior to this case being filed in common pleas court, and obviously the alleged OMA violations constitute the substance of one of the claims in this case.

{¶ 99} *Jones* is distinguishable because it involved board members attempting to invalidate their own actions. For obvious reasons, the court did not allow these claims.

{¶ 100} Again, in the case at bar we have no evidence that appellant was aware that OMA violations were occurring yet continued to participate in the process. Thus, the trial court did not err in concluding that appellant had not waived its OMA claims. Accordingly, ORDC's sixth cross-assignment of error and C&OR's first cross-assignment of error are overruled.

{¶ 101} In its second cross-assignment of error, C&OR contends that appellant acquiesced in the RFP process and should be estopped from asserting its OMA claims. For the same reasons as discussed under the previous assignments of error regarding waiver, we reject C&OR's argument. Again, there is no evidence that appellant was aware that OMA violations were occurring or had occurred. Therefore, estoppel, if even applicable to OMA claims, does not bar appellant's action herein.

{¶ 102} C&OR's second cross-assignment of error is overruled.

{¶ 103} In summary, all of appellees' cross-assignments of error are overruled. The trial court did not err in concluding that there were violations of the OMA and in invalidating Resolution 97–13 and the related operating agreement pursuant to R.C. 121.22(H).

{¶ 104} We now turn to appellant's appeal. We address appellant's third assignment of error first, as it is related to the cross-appeal. Appellant contends that the trial court erred in failing to award it attorney fees based on ORDC's violation of the OMA. In its decision finding such violations, the trial court also stated that ORDC "shall pay" appellant all costs and attorney fees upon submis-

sion of the appropriate application and affidavit. A hearing was held on the reasonableness and amount of attorney fees. On September 18, 2000, the trial court rendered a decision declining to award attorney fees. The trial court found that, under R.C. 121.22(I), appellant's OMA action did not result in a significant enough public benefit to merit an attorney-fees award and that ORDC acted reasonably and in good faith in holding closed meetings.

{¶ 105} Appellant argues that this was error because, under R.C. 121.22(I)(2), an attorney-fees award is mandatory, that there is no need to show a public benefit, and that there was no evidence supporting a reduction of attorney fees. R.C. 121.22(I), in effect at the time pertinent hereto,[5] stated:

{¶ 106} "(I)(1) * * * Upon proof of a violation or threatened violation of this section in an action brought by any person, the court of common pleas shall issue an injunction to compel the members of the public body to comply with its provisions.

{¶ 107} "(2)(a) If the court of common pleas issues an injunction pursuant to division (I)(1) of this section, the court * * * shall award to that party all court costs and, subject to reduction as described in this division, reasonable attorney's fees. The court, in its discretion, may reduce an award of attorney's fees to the party that sought the injunction or not award attorney's fees to that party if the court determines both of the following:

{¶ 108} "(i) That, based on the ordinary application of statutory law and case law as it existed at the time of violation or threatened violation that was the basis of the injunction, a well-informed public body reasonably would believe that the public body was not violating or threatening to violate this section;

{¶ 109} "(ii) That a well-informed public body reasonably would believe that the conduct or threatened conduct that was the basis of the injunction would serve the public policy that underlies the authority that is asserted as permitting that conduct or threatened conduct."

{¶ 110} First, we note that given the language above, a trial court's determination as to whether to award attorney fees under R.C. 121.22(I) is a matter of discretion, which this court will not reverse absent a showing of an abuse of such discretion. However, we review questions pertaining to law on a de novo basis.

{¶ 111} ORDC cites several cases in support of the trial court's conclusion that attorney fees were not warranted on the basis that no significant public benefit would result from appellant's OMA action. However, such cases are not

---

**5.** R.C. 121.22(I) was amended effective May 6, 1998, and contained insignificant changes.

applicable to the request for attorney fees here. First, those cases largely dealt with the Ohio Public Records Act under R.C. 149.43 and not the OMA. Second, even if the analysis set forth in such cases was once applicable to attorney fees under the OMA, such is no longer the case due to an amendment to R.C. 121.22(I) in 1994. R.C. 121.22(I) now clearly sets forth the test to be applied in determining whether attorney fees should be reduced or denied, and it is this test that courts must now follow.

{¶ 112} Here, the trial court applied the wrong standard. The trial court engaged in an analysis which included whether appellant's OMA action would result in a public benefit and whether ORDC acted reasonably and in good faith in holding closed meetings. The public benefit analysis is simply not applicable to cases under R.C. 121.22(I). The trial court's conclusion based on such analysis is erroneous. Therefore, this case must be remanded for a determination of whether an award of attorney fees is proper under the correct standard set forth in R.C. 121.22(I)(2)(a).

{¶ 113} In light of the above, the trial court erred as a matter of law in applying the wrong standard to appellant's request for attorney fees under R.C. 121.22(I). Accordingly, appellant's third assignment of error is sustained.

{¶ 114} Appellant's remaining two assignments of error address its claims concerning the merits of the RFP process. Appellees have filed a motion to dismiss the appeal with respect to appellant's first and second assignments of error on the basis that all such arguments are entirely moot. Appellees assert that appellant's appeal as to these issues is moot because appellant failed to seek a stay of the trial court's judgments and that, on November 9, 2000, ORDC adopted Resolution 00–16. Resolution 00–16 authorized ORDC, through its executive director, to execute all necessary documents in order to enter into an operating agreement with C&OR for the management of the Panhandle line. Such an operating agreement was entered into on November 9, 2000, replacing the 1997 agreement set aside by the trial court's decision based on OMA violations. Appellees have operated the Panhandle line under the 2000 agreement since then.

{¶ 115} Appellees rely upon this court's opinion in *Pontiac Motor Div. v. Ohio Motor Vehicle Dealers Bd.* (Sept. 15, 1987), Franklin App. No. 87AP–48, 1987 WL 17391, as authority for the proposition that the 2000 agreement moots all issues arising out of the RFP process and the 1997 agreement. In *Pontiac*, the court of common pleas dismissed the dealership's protest of a manufacturer's intention to establish a new dealership in close proximity to the plaintiff's existing dealership. The existing dealership appealed, and the manufacturer moved to dismiss the appeal on the basis that the manufacturer and the new dealership had entered

into a franchise agreement immediately upon issuance of the court of common pleas' decision, which had not been stayed pending appeal. In our decision in *Pontiac*, we cited *Travis v. Pub. Util. Comm.* (1931), 123 Ohio St. 355, 175 N.E. 586, for the proposition that the time and energy of the court should not be expended on doing a vain act. We indicated that, because the existing dealership had failed to obtain a stay of the trial court's decision, and the manufacturer and new dealership had expeditiously pursued a course of action permitted by the trial court's decision, the existing dealership's protest had become moot.

{¶ 116} Whatever value *Pontiac* may have for cases emanating from the Motor Vehicle Dealers Board, we are hesitant to extend that case's rationale to other areas of law. The reasoning of *Pontiac*, when carried to its logical conclusion, would render the appellate process irrelevant in all circumstances in which the prevailing parties at the trial court level could rush to implement a new agreement in accordance with the trial court's decision, regardless of the outcome on appeal. Moreover, we find that the failure to request a stay of the trial court's decision in such cases is not necessarily conclusive; the trial court would not be obligated to grant such a stay, and the existence of a stay would have no bearing on the appellate court's ultimate determination of legality of the original agreement. We accordingly find that *Pontiac* is less than instructive on the facts before us.

{¶ 117} However, three bases exist for finding that the issues raised in appellant's first and second assignments of error are not mooted in toto, although some aspects may no longer be justiciable: (1) the 2000 operating agreement entered after final judgment by the trial court is grounded in the original RFP process, the integrity of which was attacked in appellant's complaint, and is thus an extension of the administrative process that was implicated in the action; (2) appellant's complaint seeks a declaration that appellant should have been awarded the operating agreement, and such relief is not foreclosed by the subsequent 2000 operating agreement which is subject to the doctrine of lis pendens; and (3) even if the above factors did not bring the 2000 operating agreement within the scope of this appeal, the doctrine of mootness would operate to cause unjust results in this case, and the exception for causes raising issues "capable of repetition, yet evading review" should apply.

{¶ 118} Appellant's initial and amended complaints in this matter included a multiplicity of issues, including the contention that, pursuant to the explicit factors in the RFP, appellant should have been selected as the rail operator had ORDC followed its own selection criteria. Because appellant sought a declaration that the RFP process and selection factors were binding upon ORDC, that ORDC was obligated to strictly adhere to the scoring factors set forth therein, and that pursuant to those factors appellant should properly have been awarded the

operating agreement, the fact that the operating agreement ultimately awarded to the C&OR was voided and replaced by a later operating agreement does not moot appellant's claim that it is entitled to be declared the winner of the RFP process and awarded the operating agreement. Moreover, the 2000 operating agreement does not arise independently of the issues within the scope of this appeal, since it resulted from the same RFP process and Resolution 00–16 refers to the RFP process in awarding the operating agreement. For these reasons, multiple aspects of the initial action are not mooted and should be considered by this court.

{¶ 119} Even if the 2000 operating agreement were found to have been established independently of the prior RFP process, it would still arguably not curtail the scope of this appeal under the doctrine of lis pendens, under which a party to an action that takes an interest in property during the pendency of litigation will be bound by a subsequent judgment in the action. Appellees argue that the doctrine of lis pendens does not extend beyond final judgment in the trial court. There is authority to the contrary, stating that lis pendens will apply during the pendency of an appeal. 66 Ohio Jurisprudence 3d (1986) 471, Lis Pendens, Section 32; *Ashworth v. Hankins* (1966), 241 Ark. 629, 408 S.W.2d 871; *Fed. Deposit Ins. Corp. v. Charlton* (1993), 17 Cal.App.4th 1066, 21 Cal.Rptr.2d 686; *Perry Park Country Club, Inc. v. Manhattan Sav. Bank* (1991), 813 P.2d 841; *O'Laughlin v. Chicago* (1976), 65 Ill.2d 183, 2 Ill.Dec. 305, 357 N.E.2d 472. While the doctrine of lis pendens does not prevent persons, in this case ORDC and the C&OR, from transacting an interest in property subject to litigation, the doctrine does place any such conveyed interest at risk and subject to the final outcome of the litigation. *Martin, Rochford & Durr v. Lawyer's Title Ins. Corp.* (1993), 86 Ohio App.3d 20, 619 N.E.2d 1130. The parties to the 2000 operating agreement were clearly aware of the litigation and based their new agreement in part upon the outcome in the trial court and, thus, were on notice that any new agreement, as an interest in the property subject of litigation, would be affected by the outcome of the case upon appeal, including any finding that the RFP process must be adhered to and the operating agreement awarded to appellant. As the res of the litigation is still implicated by the outcome of this appeal, the right to operate the Panhandle line is not a mooted matter for purposes of this appeal.

{¶ 120} We accordingly conclude that appellee C&OR was on notice that any interest it acquired, even by subsequent resolution by ORDC, would be acquired pendente lite and therefore at risk subject to the final resolution of all claimed error in this case.

{¶ 121} Moreover, even if the 2000 operating agreement were determined to be independent and distinct from the prior RFP process, and lis

pendens were found not to apply to this case, this case is postured so that an application of the mootness doctrine would create the possibility of serious injustice. As such, it would appear appropriate to apply the classic exception to mootness, invoked in cases that are "capable of repetition, yet evading review." This exception applies in exceptional circumstances where an action is both too brief in its duration to be fully litigated before its cessation or expiration, and there is a reasonable expectation that the same complaining party will be subject to the same circumstances again. *State ex rel. Calvary v. Upper Arlington* (2000), 89 Ohio St.3d 229, 729 N.E.2d 1182. In the present case, it is possible that a series of illegal orders authorizing an operating agreement with the C&OR could be sequentially effected, each replacing a prior order as the prior order reached final judicial review, thus perpetually mooting the case and forestalling any intervention in favor of enforcing appellant's rights. Regardless of whether ORDC in fact undertook to evade review deliberately through this means, the possibility of endless repetition of this scenario, extended through a series of lawsuits by appellant, could continue ad infinitum. Faced with eternally bootstrapped mootness in this manner, it would be appropriate for an appellate court to address the underlying issues rather than disposing of them on grounds of mootness.

{¶ 122} Having concluded that issues raised in appellant's first and second assignments of error are not rendered moot in toto, we proceed to address the merits of the issues raised therein.

{¶ 123} Appellant's first assignment of error asserts that the trial court erred in failing to find in favor of appellant in its action for declaratory judgment (count one of the third amended complaint), in which appellant sought a declaration that it should have been selected as the Panhandle line operator under the RFP process, and the resulting operating agreement with C&OR should have been declared void. Appellant also asserts error on the part of the trial court in failing to grant injunctive relief (count two of the third amended complaint), which sought an injunction ordering ORDC to award the Panhandle line operating agreement to appellant.[6]

{¶ 124} To the extent that appellant seeks declaratory judgment that the 1997 operating agreement must be found void, such a specific finding is, in fact, mooted by the voiding of that agreement on OMA grounds. To the extent, however, that appellant seeks a declaration that the RFP process was illegal, the matter remains a justiciable controversy, as the RFP process provided the

---

6. It should be noted that counts three and five of appellant's third amended complaint, raising claims for monetary damages and intentional interference with a business relationship, are not raised in the current appeal. The remaining count of appellant's five-count amended complaint, count four, raises the OMA claims addressed supra in this decision.

underpinning for both the 2000 operating agreement entered into with C&OR, and for appellant's assertion that it is entitled to a mandatory injunction ordering ODRC to award the Panhandle line operating agreement to appellant.

{¶ 125} The trial court made extremely extensive and detailed findings of fact regarding the entire RFP process as part of its ultimate decision in this case. To the extent that appellant asserts on appeal that these findings of fact were against the manifest weight of the evidence, we note that the weight to be given the evidence and the credibility of witnesses are primarily matters for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. When addressing a trial court's decision on manifest weight of the evidence issues, this court is guided by the presumption that the findings of the trial court were correct. The rationale for this presumption is that the trial court is in the best position to view witnesses and observe their demeanor, voice inflection, and gestures. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. Therefore, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by this court on appeal as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

{¶ 126} Both parties agree that the leading Ohio case on the issuance of injunctions on complaints brought from RFP proceedings is *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646. *Danis* involved the selection of a provider of solid waste disposal services pursuant to an RFP process. A disappointed proposer filed suit seeking an injunction preventing award of the solid waste contract to the prevailing proposer. After the trial court denied injunctive relief, the court of appeals reversed in part, finding that although the defendant, Clark County Solid Waste Management District, was not obligated by statute to follow a competitive bid process, the district had voluntarily committed itself to a competitive bidding process through the RFP. The appellate court further found that the district had violated its own bidding rules, and had failed to consider plaintiff's bid in good faith. Upon appeal, the Ohio Supreme Court, however, reversed the court of appeals' decision and reinstated the trial court's denial of injunctive relief. The RFP as issued in *Danis* contained numerous reservations of the district's obligation to accept only the lowest and best proposal but, "rather, informed bidders that it would accept the proposal, 'or part thereof,' it deemed to be 'in the best interest of the District and its Residents.'" *Danis*, at 603–604, 653 N.E.2d 646. The Ohio Supreme Court accordingly held that "the District was bound to follow the conditions it had set for itself in the RFP document, but was not required to follow the [statutory bidding] requirements of R.C. Chapter 307." Id.

at 604, 653 N.E.2d 646. Because the solid waste district sufficiently defined the RFP process as subject to eventual negotiation of a final agreement which might vary substantially from the original terms of the RFP, the unsuccessful bidder was not entitled to an injunction, absent fraud or abuse of discretion by the district, to invalidate the outcome of the RFP. Id. at 605, 653 N.E.2d 646. Summing up, the Ohio Supreme Court stated that "a county solid waste management district * * * may adopt a procedure by which it first issues a request for proposals to be followed by subsequent negotiation with successful respondents." Id. at 603, 653 N.E.2d 646.

{¶ 127} The parties to the present appeal urge diametrically opposed interpretations of the *Danis* case. Appellant asserts that the Ohio Supreme Court clearly held in *Danis* that, once a government entity issues an RFP, it is bound by the terms expressed therein and may not deviate in the slightest from those literal terms when rating proposals and negotiating with the finalist proposers. Appellees, to the contrary, rely on *Danis* for the proposition that modifications to an RFP which are done rationally, fairly, and in good faith, based upon the best interest of the parties when arriving at a mutually beneficial agreement, are within the discretion of the public agency issuing the RFP. Our interpretation of *Danis* lies between these extremes. Where the RFP in question provides for discretion on the part of the issuing authority, pursuant to *Danis*, absent fraud or abuse of discretion, the issuing authority may vary the terms of the ultimate agreement from the original guidelines of the RFP. Where the RFP explicitly forecloses variance, however, we read *Danis* as requiring adherence to the terms of the RFP when executing the resulting contract.

{¶ 128} Appellant argues that the 1997 operating agreement deviated from the announced conditions of the RFP in several scoring conditions. Appellant further argues that the RFP contained a number of "non-negotiable principles" specifically set forth in the RFP, which were not fully incorporated into the 1997 operating agreement.

{¶ 129} With respect to the scoring, appellant first argues that ORDC did not incorporate 1994 federal railroad administration data into the scoring process because C&OR failed to furnish such safety data for that year in support of its proposal. In the absence of C&OR safety information for 1994, ORDC deleted all 1994 data from all proposers, considering only 1995 and 1996 safety data. The trial court found that this change in scoring by ORDC did not present a substantial deviation from the original terms of the RFP, based upon expert testimony heard at trial that two years of safety data were sufficient to score the proposers in the safety category. The testimony of Randy Gustafson, a railroad consultant employed by Stone Consulting, the firm hired by ORDC to aide in preparation of the RFP, is found in the record. Gustafson clearly was well-

qualified to testify as an expert in the case, and his testimony supports the trial court's conclusion both with respect to the feasibility of basing safety data on two years' experience for all proposers, and the relative safety records of appellant and C&OR. We accordingly agree with the trial court that the scoring in the safety data category did not represent a substantial deviation from the terms of the RFP.

{¶ 130} Appellant next argues that ORDC deleted the category of "transition planning" in Phase I and II RFP scoring. The testimony of Lou Jannazo, a planner with ORDC, Gustafson, and railroad consultant Gary Landrio, all agreed that, if transition planning had been incorporated into the scoring, C&OR would have received a perfect score of five points because, as the current operator of the Panhandle line, retention of C&OR would have avoided any transition issues entirely. Jannazo testified, in fact, that he felt that the score was best omitted because it would be unfair to other proposers, who would be obligated to provide and plan for a smooth transition, whereas C&OR would automatically receive a perfect score of five. There was therefore competent, credible evidence before the trial court to conclude that the five points awardable in transition planning, out of the total seven-hundred point scale, was a de minimis category which would not have affected the outcome of scoring as between appellant and C&OR, and that ORDC's rationale for deleting this category was justified, did not prejudice appellant, and quite possibly favored appellant. We accordingly agree with the trial court that there was no prejudicial deviation from the RFP in this respect.

{¶ 131} The third scoring category raised by appellant was "description of operations." In both Phase I and Phase II scoring, appellant and C&OR were treated equally by the Selection Committee, each scoring a total of forty-eight points. Gustafson testified that both appellant and C&OR proposed essentially identical operation plans for scoring purposes. Since both final proposers received forty-eight point scores in the Phase I and Phase II score sheets, this argument by appellant is unsupported by the record in any manner, because no prejudice can be shown.

{¶ 132} Appellant also challenges the "employee injury ratio" category scoring, in which ORDC substituted other sources for the FRA safety data bases mentioned in the RFP. At trial, Gustafson used the 1994 FRA data introduced by appellant and recalculated the scores, which yielded a net one-point difference in C&OR and appellant's relative scores. In light of the final point totals in the Phase II scoring process, even if the deviation from the RFP were found to be impermissible, no prejudice to appellant can be shown.

{¶ 133} The last scoring item contested by appellant is the "track maintenance" section. Appellant asserts that the trial court abused its discretion by permitting C&OR to submit 1996 maintenance information after the Phase II submission deadline. According to the express terms of the RFP, "ORDC reserves the right to seek information from Proposers * * * for clarification purposes." RFP at 18. The testimony of Jannazo, Landrio, Gustafson, and others was consistent that the Phase II submittals required clarification based on recent heavy expenditures by the C&OR on the Panhandle line for maintenance, which assisted the ORDC in assessing the maintenance history of the proposers. We agree with the trial court that it was within the ORDC's discretion to assess the proposals under the clearest and most up-to-date information available that would give an accurate picture of the maintenance expenditure history of the proposers.

{¶ 134} Finally, appellant argues that it was prejudiced by the deletion of the "community relations" category of the score sheet. The original RFP stated that each proposer would be scored in a fifty-point community relations category. Questions arose in the RFP process about the accuracy of the methodologies used in assessing community relations efforts of the proposing railroads. In Phase I scoring, all proposers were awarded thirty points. In Phase II scoring, the criterion was removed entirely and both appellant and C&OR therefore received no points. Jannazo, ORDC planner Charles Brown, and ORDC member Donald Yerkes each testified at trial that there was a concern that the community relation surveys were not reliable because ORDC staff were experiencing trouble locating suitable members of the community to survey, and those surveyed were often uncertain about the exact identity of the railroad about which they were being questioned. ORDC therefore concluded that relying upon irrational and arbitrary assessments of the community relations status of proposing railroads would be more prejudicial to the process than eliminating this category entirely. Appellant's brief upon appeal asserts that "it would be pure speculation to assume that Wheeling would not have won this category." Conversely, in light of the reasonable pretext given by ORDC for deletion of the category, the trial court was not obligated to engage in even more tenuous speculation about appellant's reputation in the communities it serves and, thus, speculation on the prejudice to appellant resulting from deletion of the category. In addition, appellees presented evidence at trial suggesting that, had the community relations survey data actually collected by ORDC staff been scored under various methodologies, C&OR would have received a slightly higher score than appellant in Phase I.

{¶ 135} In addition to the various deviations from the scoring procedure alleged by appellant above, appellant asserts that C&OR should have been

rejected as a proposer because C&OR did not accept the list of "non-negotiable principles" outlined in the RFP that were to be incorporated into the operating agreement. With respect to the nonnegotiable principles, the RFP provided as follows:

{¶ 136} "The Ohio Rail Development [C]ommission (ORDC) places a very high value on using the Panhandle line for fostering economic development in Eastern Ohio and in knowing and understanding the economic status of our contract operator so that ORDC can effectively administer the line. The principles below will be included in an operating agreement between ORDC and the selected operator. Any bidder who does not accept these principles will be eliminated from further consideration.

{¶ 137} "• ORDC will reserve the right to allow other railroads on the Panhandle line for a reasonable trackage rights fee for the purpose of moving overhead traffic.

{¶ 138} "• ORDC will reserve the right to allow other railroads on the Panhandle line for a reasonable trackage rights fee for the purpose of serving new rail customers not currently using rail service on the "Panhandle."

{¶ 139} "• ORDC will reserve the right to allow passenger or excursion operations over the line provided that these operations properly insure and indemnify the contract operator.

{¶ 140} "• ORDC will require that ORDC, or its designee, be immediately provided trackage rights at a reasonable fee over any trackage now owned by the contract carrier (or purchased or otherwise acquired while the railroad is ORDC's contract carrier) which is in any way contiguous with the Panhandle line and needed for access to connecting railroads in and around the Columbus, Ohio area and the Mingo Junction/Steubenville/Weirton areas. In addition, ORDC will require that ORDC have the first right of refusal to purchase such connecting tracks in the event that ORDC terminates its relationship with the contract operator on the Panhandle.

{¶ 141} "• ORDC will require that the contract operator maintain track to existing FRA classifications and establish a maintenance plan acceptable to ORDC. (Generally, Panhandle branchlines are in Class I condition and mainlines in Class II and III conditions.)

{¶ 142} "• ORDC will require that the maintenance responsibilities of the contract operator include all railroad responsibilities inherited from previous rail operators and owners.

{¶ 143} "• ORDC will require that, on a confidential basis, the contract operator provide complete and full access to the books and records of the Panhandle operations as well as those of affiliated companies, railroad or non-

railroad, which have an inter-relationship with the Panhandle operation. Further, ORDC will require that within 90 days after the end of its fiscal year, the contract operator will provide ORDC with an audited financial report, prepared by a Certified Public Accountant, of the financial status of the line, including profit-loss statements, balance sheet, and cash flow statements. ORDC will reserve the right to audit the Panhandle financial situation on a yearly basis.

{¶ 144} "● ORDC will require that carloading information from the Panhandle be supplied on a confidential basis which breaks down carloadings by customer, commodity, origin and destination, and interchange points.

{¶ 145} "● ORDC will require that ORDC approve any contract that ORDC's contract carrier enters into with rail shippers or railroads which goes beyond the time of the term of the ORDC operating agreement.

{¶ 146} "● ORDC will require that ORDC approve any significant change in the railroad track structure or to the rail property.

{¶ 147} "● ORDC will require that ORDC approve any and all property leases, easements, permits or other property related contractual agreements which the contract operator desires to enter into."

{¶ 148} Appellant argues on appeal that these nonnegotiable principles were obligatory contract terms and, absent their incorporation into the ultimate Panhandle line agreement, any proposal resulting in such an operating agreement must be invalidated. Appellant also asserts that the trial court erred in finding that the essence of all the nonnegotiable principles had been appropriately and satisfactorily incorporated into the 1997 operating agreement.

{¶ 149} Upon the Selection Committee's determination that C&OR's proposal should be found the Phase II winner, C&OR and Thomas O'Leary, chairman of the ORDC, began negotiating an operating agreement. Both Mr. O'Leary and Donald Yerkes testified that they viewed the entire RFP process as a "design-build" one, in which both sides would retain flexibility to modify the terms of an ultimate agreement for the mutual benefit of the public and parties concerned. ORDC's position in this respect is not entirely consistent with labeling certain RFP conditions as "non-negotiable." As such, this aspect of the present case falls under the stricter reading of *Danis* advocated by appellant. Appellant points to several aspects of the 1997 agreement that do not conform to the nonnegotiable principles. Most notable are the absence of trackage rights agreements to protect access to the Panhandle line for other operators, particularly on the west end in Columbus where C&OR owns outright a short section of track which is essential for connection to other central Ohio railroads. Without access over this track the Panhandle line would be isolated from its western connections.

{¶ 150} Appellant's position is that C&OR "rejected" the nonnegotiable principles and should have been disqualified under the terms of the RFP. Selection Committee member Charles Brown testified, to the contrary, that C&OR, despite some earlier correspondence expressing reluctance on the part of C&OR with respect to some of the nonnegotiable principles, ultimately agreed to these principles as part of the RFP process:

{¶ 151} "Q. Mr. Brown, there was a Selection Committee meeting with both proposers that you testified to earlier, correct?

{¶ 152} "A. That is correct.

{¶ 153} "Q. And that was on May 12th?

{¶ 154} "A. Yes, sir.

{¶ 155} "Q. And do you recall, sir, at that meeting, were the proposers asked questions with respect to the nonnegotiable principles?

{¶ 156} "A. Yes.

{¶ 157} "Q. And do you recall, sir, if Mr. Jacobson was at the Selection Committee meeting as one of the attendees on behalf of the C&OR?

{¶ 158} "A. I do recall that he was, sir.

{¶ 159} "Q. Okay. And you recall, sir, you asking Mr. Jacobson any questions about the nonnegotiable principles at that meeting?

{¶ 160} "A. Yes, sir.

{¶ 161} "Q. And what did you ask him?

{¶ 162} "A. I asked him if he agreed with the nonnegotiables, if he had any problem with it.

{¶ 163} "Q. What was his response?

{¶ 164} "A. He said he agreed with them, didn't have any problem."

{¶ 165} Furthermore, C&OR's proposal submitted in response to the RFP does not contain any reservations as far as the nonnegotiable principles and, regardless of whether the nonnegotiable principles were ultimately included in the 1997 operating agreement, the trial court did not err in rejecting appellant's contention that C&OR should have been disqualified from the RFP process entirely based upon nonsubmission to the nonnegotiable principles of the RFP.

{¶ 166} The trial court engaged an extensive analysis of the evidence and conclusions of fact regarding whether the nonnegotiable principles, in letter or in spirit, were incorporated into the 1997 agreement. Since the 1997 agreement has been set aside, its terms are no longer before us and we are concerned only with the RFP process. Even if certain nonnegotiable principles were found not to be

included in the 1997 agreement, in light of O'Leary's testimony that ORDC expected to negotiate with some flexibility the ultimate terms of the agreement after selecting a winning proposer, noninclusion of the nonnegotiable principles would not be conclusive evidence which would relate back to demonstrate a "rejection" of those principles by C&OR prior to prevailing in the RFP process. Since the 2000 agreement itself is not before us in this appeal, we express no opinion on whether the nonnegotiable principles were incorporated into the 2000 operating agreement, or the effect of the noninclusion of these principles on the validity of that agreement.

{¶ 167} Based upon the foregoing, we find that the trial court did not err in concluding that the RFP process was substantially adhered to, that any deviations from the announced RFP standard were applied in an even-handed and fair manner, based upon the necessities of the bidding process, to all proposers, and that C&OR did not reject the nonnegotiable principles in its RFP application or during the RFP application process. Appellant's first assignment of error is accordingly overruled.

{¶ 168} Appellant's second assignment of error asserts that the trial court erred when it found that appellant lacked standing to challenge ORDC's modification or waiver of the nonnegotiable principles and failure to reject C&OR's bid for failing to comply with these. This assignment of error is rendered partially moot by the invalidation of the 1997 operating agreement. To the extent that it is not mooted, we have presumed standing based on *Danis,* in which the Ohio Supreme Court, implicitly at least, found standing on the part of a disappointed proposer in an RFP process. Appellant's second assignment of error is rendered moot in part and sustained in part.

{¶ 169} In summary, appellees' cross-assignments of error are overruled. Appellant's third assignment of error is sustained. Appellant's first assignment of error is overruled, and appellant's second assignment of error is rendered moot in part and sustained in part. The April 28, 1998 judgment of the Franklin County Court of Common Pleas is affirmed. The trial court's judgment denying attorney fees is reversed for the reasons set forth in this opinion, and this cause is remanded for the limited purpose of determining whether attorney fees are warranted under R.C. 121.22(I).

Judgment affirmed in part,
reversed in part
and cause remanded with instructions.

BROWN, J., concurs.

TYACK, J., dissents in part and concurs in part.

Tʏᴀᴄᴋ, Judge, dissenting in part and concurring in part.

{¶ 170} Because I conclude that the issues raised in appellant's first and second assignments of error are moot, I respectfully dissent from that portion of the majority opinion which addresses such issues.

{¶ 171} Appellees contend that appellant's first and second assignments of error are moot because appellant failed to seek a stay of the trial court's judgment(s) and that on November 9, 2000, ORDC adopted Resolution 00–16. Resolution 00–16 authorized ORDC, through its executive director, to execute all necessary documents in order to enter into an operating agreement with C&OR for the management of the Panhandle line. Such operating agreement was entered into on November 9, 2000.

{¶ 172} Appellant contends that its first and second assignments of error are not moot because (1) the operating agreement has not been fully performed and is expressly conditioned upon this court upholding the trial court's judgment, (2) the operating agreement can be invalidated because it violates the trial court's permanent injunction granted in the April 28, 1998 judgment entry (which required that ORDC award the operating agreement in accordance with the OMA), (3) the operating agreement can be invalidated based on the doctrine of lis pendens, and (4) the operating agreement can be invalidated because it violates the trial court's February 2000 stay order.

{¶ 173} The majority concludes that appellant's first and second assignments of error are not moot because the 2000 operating agreement is grounded in the original RFP process and is an extension of the administrative process that was attacked in the complaint, the declaratory relief sought by appellant to be awarded the operating agreement is not foreclosed by the existence of the 2000 operating agreement as such is subject to the doctrine of lis pendens, and unjust results would follow as the issues complained of are capable of repetition yet evade review. For the reasons that follow, I respectfully disagree with the majority's conclusions and would find that all remaining issues have been rendered moot as a result of appellant's failure to seek a stay of the trial court's judgment(s), and ORDC's subsequent adoption of Resolution 00–16 and the resulting 2000 operating agreement.

{¶ 174} First, the validity of Resolution 00–16 and the November 9, 2000 operating agreement are not contingent upon this court's decision. Resolution 00–16 does make reference to the trial court's decision. Indeed, such decision found against appellant on its RFP claims. Appellant never stayed this judgment, and the earlier Resolution 97–13 had been invalidated along with the original operating agreement as a result of the trial court's decision on appellant's OMA claims. Hence, ORDC was free to award a new operating agreement despite appellant's appeal. Such action by ORDC rendered this appeal moot.

{¶ 175} The majority states that the 2000 operating agreement is grounded in the original RFP process and is an extension of the administrative process that was the subject of the complaint. The fact that the 2000 operating agreement is related to the subject matter of the previous dealings between the parties and the litigation arising therefrom does not preclude application of the mootness doctrine. Indeed, if this were the test, there would be no mootness doctrine. Mootness arises when the subject matter of the litigation or dispute is somehow finally resolved, thereby precluding further action by a court. Hence, in all cases where mootness is implicated, the act which renders the case moot is, of course, related to the underlying case.

{¶ 176} The majority opinion discusses appellant's claims regarding the allegedly faulty RFP process and appellant's claim that it should have been awarded the operating agreement. It then concludes that the mootness doctrine does not apply despite the subsequent voiding of the original operating agreement and the existence of the 2000 operating agreement because appellant sought such relief in its complaint. However, the mootness doctrine does not involve a determination of the merits of the issues that may be rendered moot. Rather, the doctrine merely involves a determination of whether the court is engaging in a vain act. As stated above, in adopting Resolution 00–16 and in entering into the 2000 operating agreement, *and absent a stay being requested by appellant*, ORDC proceeded lawfully. Hence, because an operating agreement has been properly entered into, the issues presented in appellant's first and second assignments of error are moot.

{¶ 177} Further, I believe that this court's opinion in *Pontiac Motor Div. v. Ohio Motor Vehicle Dealers Bd.* (Sept. 15, 1987), Franklin App. No. 87AP–48, 1987 WL 17391, is directly on point. In *Pontiac*, we indicated that had the dealership obtained a stay of the common pleas court's dismissal of its protest, a decision by the court of appeals on the merits may well have dictated a different result. However, a stay was not obtained, and the manufacturer had expeditiously pursued a course of action permitted by the common pleas court's decision. We concluded that such course of action rendered the issues moot. See, also, *Montgomery Cty. Bd. of Commrs. v. Saunders* (Nov. 2, 2001), Montgomery App. No. 18592, 2001 WL 1346087.

{¶ 178} In the case at bar, the situation is as follows. The trial court invalidated the original resolution (Resolution 97–13) and the related operating agreement based on the finding of violations of the OMA. Hence, no resolution authorizing an agreement and no operating agreement as to the Panhandle line existed. Further, on July 10, 1999, the trial court concluded that it lacked the authority to issue an injunction compelling ORDC to award the operating agreement to appellant. On September 14, 2000, the trial court concluded that

there was no requirement that ORDC use competitive selection in leasing the line, that ORDC and the Selection Committee substantially complied with the RFP, and that ORDC and the Selection Committee acted reasonably and in good faith in scoring Phase I and Phase II responses. Appellant never requested nor obtained a stay of these final orders/judgments. In adopting Resolution 00–16 and in entering a new operating agreement with C&OR, ORDC pursued a course of action that was permitted given the above decisions/judgments and the lack of a stay of such decisions/judgments.

{¶ 179} A new operating agreement as to the Panhandle line is now in existence. This course of conduct has rendered the issues set forth in appellant's first and second assignments of error moot. Therefore, I would grant appellees' motion to dismiss the appeal.

{¶ 180} The majority further concludes that even if the mootness doctrine is applicable herein, an exception exists in that the issues involved are capable of repetition yet evade review. The majority correctly sets forth the exception to the mootness doctrine as stated in *State ex rel. Calvary v. Upper Arlington* (2000), 89 Ohio St.3d 229, 231, 729 N.E.2d 1182:

{¶ 181} "'* * * This exception applies only in exceptional circumstances in which the following two factors are both present: (1) the challenged action is too short in its duration to be fully litigated before its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again. * * *'"

{¶ 182} However, I disagree that such an exception is implicated in the case at bar.

{¶ 183} The two factors simply are not present in the instant case. The majority states that in the case at bar it is possible that a series of illegal orders authorizing an operating agreement with C&OR could be put into effect, each replacing a prior order as the prior order reached final judicial review, thus perpetually mooting the case. There is absolutely no evidence of this in the case at bar. As stated by this court in *James A. Keller, Inc. v. Flaherty* (1991), 74 Ohio App.3d 788, 792, 600 N.E.2d 736, there must be more than a theoretical possibility that the action will arise again. See, also, *BECDIR Constr. Co. v. Proctor* (2001), 144 Ohio App.3d 389, 760 N.E.2d 437, discretionary appeal not allowed (2001), 93 Ohio St.3d 1464, 756 N.E.2d 1238.

{¶ 184} The actions giving rise to the present lawsuit involved one RFP process for one operating agreement of a particular rail line. It did not involve all operating agreements that may arise in the future. If there are further operating agreements involving the Panhandle line, ORDC may do whatever it is lawfully entitled to do in order to manage the line. Such actions are separate and

apart from the present case. ORDC does not have, as the majority suggests, unbridled control over the RFP process (if it chooses to utilize such process). If a party to such future action wishes to litigate any matter arising out of such process, it may do so. If such party loses at the trial court level, it may request a stay, which most certainly would be granted. Thus, the scenario suggested by the majority simply could not occur.

{¶ 185} Again, had appellant simply requested a stay, ORDC could not lawfully have adopted Resolution 00–16 and the 2000 operating agreement. Again, without a stay, ORDC did what it lawfully had every right to do. Thus, it was appellant's failure to even request a stay that is the linchpin in the case before us, not any veiled attempt by ORDC to moot the issues.

{¶ 186} For all of the above reasons, I disagree with the majority that an exception to the mootness doctrine exists in the case at bar.

{¶ 187} Appellant contends that the 2000 operating agreement violates the trial court's injunction granted in April 1998. However, the April 1998 injunction compelling ORDC to comply with the OMA in awarding the operating agreement has no effect on the application of the mootness doctrine herein. As stated above, ORDC was within its rights and authority to pass Resolution 00–16. This, in effect, ended the case. If appellant believes that it has an *additional* and *separate* OMA claim arising out of the adoption of Resolution 00–16, such claim was not the subject of the underlying case nor is it part of this appeal.

{¶ 188} The majority also concludes that the doctrine of lis pendens applies to the instant case. I disagree. R.C. 2703.26 addresses the doctrine of lis pendens and states:

{¶ 189} "When summons has been served or publication made, the action is pending so as to charge third persons with notice of its pendency. While pending, no interest can be acquired by third persons in the subject of the action, as against the plaintiff's title."

{¶ 190} As indicated above, the action is no longer pending due to appellant's failure to request and obtain a stay and ORDC's subsequent lawful actions. Hence, lis pendens is not implicated.[7] The majority also states that the parties were on notice that any new agreement could be affected by the outcome on appeal. This assumes that the appeal is not moot. Again, had a stay been obtained, this court could address the merits of appellant's claims, and the result might have been different. However, such a stay was not obtained, and a new

---

7. I also note that, it is at least debatable as to whether the doctrine of lis pendens applies in this case, as title to any real or personal property is not at issue herein.

operating agreement was entered into, thus mooting the instant appeal. Because there is no case pending, the doctrine of lis pendens does not apply.

{¶ 191} Appellant also asserts that the new operating agreement can be invalidated because it violates the trial court's February 4, 2000 order. On February 2, 2000, appellant filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin the appellees from consummating any sale of the Panhandle line. C&OR had apparently offered to purchase ORDC's interest in the Panhandle line.

{¶ 192} On February 4, 2000, the trial court journalized an entry prohibiting the sale of the Panhandle line or encumbrance of the right to manage the line without prior approval of the court. In so ruling, the trial court specifically stated that "a transfer of the Panhandle Rail Line *prior to the conclusion of this lawsuit* could adversely and irreparably harm the potential rights of the Plaintiff." (Feb. 4, 2000 Order at 2; emphasis added.) Despite the trial court's order, it expressly denied appellant's request for a preliminary injunction and temporary restraining order.

{¶ 193} I find no merit in appellant's contention. The February 4, 2000 order was an interim order that did not survive post-final judgment. The order itself limits its application to transfers prior to the conclusion of the lawsuit. Appellant itself, in its memorandum in support of its motion for a temporary restraining order and preliminary injunction, argued that the status quo should be maintained until the action had been fully adjudicated. This case has been fully adjudicated. The February 4, 2000 order lapsed upon the entering of final judgment on September 20, 2000, and upon appellant's failure to obtain a stay of such judgment. Thus, the February 4, 2000 order has no bearing upon what ORDC was permitted to do once final judgment was entered.

{¶ 194} In summary, for all the reasons discussed above, I would grant appellees' motion to dismiss appellant's appeal with regard to appellant's first and second assignments of error. I concur in the majority opinion as to appellant's third assignment of error and the cross-appeals.