[Cite as *Maddox v. Greene Cty. Children Servs. Bd. of Dirs.*, 2014-Ohio-2312.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE   COUNTY**

| | | |
|---|---|---|
| ALICE MADDOX | : | |
| | : | Appellate Case No. 2013-CA-38 |
| Plaintiff-Appellee/Cross-Appellant | : | |
| | : | Trial Court Case No. 12-CV-715 |
| v. | : | |
| | : | |
| BOARD OF DIRECTORS OF GREENE | : | (Civil Appeal from Greene County |
| COUNTY CHILDREN SERVICES | : |  Common Pleas Court) |
| BOARD | : | |
| | : | |
| Defendant-Appellant/Cross-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of May, 2014.

. . . . . . . . . . .

JOHN R. FOLKERTH, JR., Atty. Reg. #0016366, and PAUL M. COURTNEY, Atty. Reg. #0020085, Weprin Folkerth & Routh LLC, 109 North Main Street, 500 Performance Place, Dayton, Ohio 45402
     Attorneys for Plaintiff-Appellee/Cross-Appellant

LAWRENCE E. BARBIERE, Atty. Reg. #0027106, Schroeder, Maundrell, Barbiere & Powers, 5300 Socialville Foster Road, Suite 200, Mason, Ohio 45040
     Attorney for Defendants-Appellants/Cross-Appellees

. . . . . . . . . . . . .

HALL, J.,

{¶ 1}    Defendants Greene County Children Services Board of Directors (CSB) and Greene County Board of Commissioners appeal from the trial court's entry of judgment in favor of Plaintiff Alice Maddox on her complaint alleging violations of R.C. 121.22, Ohio's Open-Meeting Act (OMA) or "Sunshine Act." Also pending before us is a cross appeal by Maddox.

{¶ 2}    In their appeal, CSB and the Commissioners advance two assignments of error. First, they contend the trial court erred in granting Maddox injunctive relief under the OMA and in finding thirty OMA violations. Second, they claim the trial court erred in finding them liable for multiple forfeitures, attorney fees, and Maddox's back pay and benefits from June 26, 2012 to November 20, 2012.[1]

{¶ 3}    In her cross appeal, Maddox advances three assignments of error. First, she contends the trial court erred in failing to assess a $500 statutory forfeiture for each of the thirty OMA violations it found. Second, she claims the trial court erred in limiting the back pay to which it found her entitled. Third, she asserts that the trial court erred in reducing the attorney fees it awarded her for the OMA violations.

{¶ 4}    The record reflects that Maddox formerly served as executive director of Greene County Children Services. Over an extended period of time, CSB contemplated terminating her employment. Ultimately, CSB placed Maddox on administrative leave and later fired her. The

---

[1] For purposes of convenience and clarity, this opinion frequently will refer to the defendants-appellants singularly as "CSB." Although the Greene County Board of Commissioners was substituted as a defendant late in the proceedings below due to a merger of county agencies, nearly all of the issues before us involve activities of the Greene County Children Services Board of Directors and not the County Commissioners. Therefore, we find it clearer and less cumbersome to refer only to "CSB" despite the merger and despite the presence of the Greene County Board of Commissioners in the lawsuit. Where the context dictates distinguishing between the defendants-appellants, we will refer separately to the "Commissioners."

issues in the present lawsuit stem from public meetings CSB held near the end of Maddox's tenure and actions taken during those meetings. After an evidentiary hearing, the trial court made the following factual findings regarding those issues and meetings:

* * *

2. At its meeting held on February 24, 2011, the Board was provided a memorandum by the Board's chair addressing Sunshine Act concerns. At that meeting, the Board was also provided with the table of contents and treatise by the Ohio Attorney General on the Open Meeting Act, stating the requirements of conduct at meetings by public bodies in order to comply with the Sunshine Act.

3. The Board began holding executive sessions to discuss the "Executive Director's Evaluation" at the June 30, 2011 meeting. The Board's evaluation of Maddox was not complete at this time.

4. The Board continued to hold executive sessions to discuss Maddox's evaluation at its regular meetings on July 28, 2011, August 25, 2011, September 22, 2011, and October 27, 2011 * * * .

5. At the conclusion of each of these meetings, the executive session was ended and the door to the meeting room opened. The Board would then adjourn the meeting, and leave a handwritten note for the Executive Secretary so that she could record the votes take during the Executive Session. Victoria Phillips, the Executive Secretary, testified that generally at the end of executive sessions, board members would depart the building and staff would be advised that "we've concluded the business." Phillips would not be readmitted to the meetings following executive sessions, as the meeting was adjourned in her absence. Staff

would then lock up.

6. On December 11, 2011, the Board held its regular meeting, and entered into executive session "for a personnel matter." The vote to adjourn the executive session and the meeting were left for Phillips by handwritten note.

7. On January 26, 2012, the Board entered executive session to discuss "the upcoming negotiations." The Board then voted for Maddox to "prepare a white paper" and adjourned the meeting. The votes were left on a handwritten note for Phillips.

8. The Board held a special meeting on February 14, 2012 and went into Executive Session to discuss "upcoming negotiations." Again, a handwritten note was left for Phillips with the recorded votes.

9. On February 23, 2012, the Board entered executive session to discuss "upcoming negotiations." Again, the Board adjourned the meeting following executive session and left a handwritten note for Phillips.

10. On March 22, 2012, the Board held two executive sessions, the first for the stated purpose of discussing "the upcoming union negotiations and personnel matters," and the second for the purpose of "personnel matters." The meeting was not opened to the public between the first and second executive sessions. The meeting was adjourned and a type written note was left for Phillips.

11. After the March meeting, but prior to the April meeting, board member Cathy Cook tabulated the Board members' evaluations of whether Maddox had met the previously implemented Performance Improvement Plan (PIP). After tabulating the evaluations, Cook and board member Pam Brooks met with County

Human Resources for advice on how to terminate Maddox. A Separation Agreement was prepared in anticipation of terminating Maddox at the April meeting.

12. On April 26, 2012, the Board added an executive session to the agenda "for a personnel matter," as requested by Cook, "[b]ecause the Board needed to take action on the matter of Ms. Maddox because of the way the performance evaluation, performance plan evaluation came back." Board member Barbara Burson testified that at this point a majority of the Board members expected that Maddox would resign as requested or be terminated.

13. Maddox was called into the April 26, 2012 executive session and offered the Separation Agreement, which she did not sign. Maddox was then placed on administrative leave. She was escorted to her office to gather her possessions and turn in county property. She was instructed not to return to the premises. Randy Roach testified that the Board's intention at this point was "to have Alice separated either willing . . . or otherwise."

14. Maddox was effectively terminated on April 26, 2012, with her pay to cease on May 4, 2012.

15. On May 22, 2012, the Board held a special meeting and entered into executive session to discuss "threatened or imminent litigation." The Board did not discuss any new basis for terminating Maddox.

16. On May 31, 2012, the Board held its regular meeting. During the public portion of the meeting, Steven K. Haller, the Greene County Prosecuting Attorney, spoke as a member of the public. Haller told the Board that the manner

in which they terminated Maddox violated the Sunshine Act. The Board did not dispute that Maddox had been terminated.

17. Later at the May 31, 2012 meeting, a motion was made to enter into executive session to "discuss a personnel issue." An audience member interjected and questioned whether said motion complied with the Sunshine Act. The motion was then restated "to discuss personnel issues relating to the Executive Director position." During this session, no new reasons for terminating Maddox were discussed. Following the executive session, the meeting was adjourned, despite the large group of people waiting to be re-admitted. A Board member left a handwritten note for Phillips so that she could record the votes.

18. On June 26, 2012, the Board held its regular meeting. The Board entered into an executive session to consider "the dismissal or discipline of a public employee . . . ." An attorney for the Board also attended the executive session. No new discussions were held regarding the decision to terminate Maddox. When the Board returned to open session, a motion was made to terminate Maddox effective June 26, 2012, and pay her from May 4, 2012 until June 26, 2012. Two board members spoke in regard to the motion. The Board then voted to terminate Maddox and pay her through June 26, 2012. Randy Roach testified that the purpose of the June 26 action was to formally terminate Maddox, which was thought to have been accomplished in April.

(Doc. #102 at 2-6).

{¶ 5}     In an earlier ruling, the trial court had found that the stated purpose of the April 26, 2012 executive session lacked specificity required by the OMA and that Maddox's placement

on administrative leave was invalid. It granted her injunctive relief and compensation from April 26, 2012 until June 26, 2012. It also awarded her reasonable attorney fees and a $500 statutory civil forfeiture. (Doc. #25). In a separate ruling containing the foregoing factual findings, the trial court found additional violations of the OMA. It reasoned:

> The court finds that each of the executive sessions held up to the termination of Maddox [was] held for an improper purpose, whether that purpose was for "personnel matters" or other stated purposes, none of which were enumerated exceptions under R.C. 121.22(G). The executive sessions lacked the specificity to inform the public of their purpose. Employee evaluation is not an enumerated exception, and the court will not read in an exception where none is stated.

> The court also finds that the June 26, 2012 action to terminate Maddox was invalid. A violation of the Sunshine Act cannot be cured when discussions and deliberations were held in an improperly convened executive session. Although the public was permitted at a later meeting to comment on the termination, the testimony of Barbara Burson and Randy Roach indicates that the decision to terminate Maddox was reached in April, and the June meeting was intended to reconfirm the vote in what the Board believed was the proper statutory method. The purpose for the executive session stated at the June 26, 2012 meeting, to discuss "personnel issues relating to the Executive Director position" also does not comply with the Sunshine Act, as it makes no reference to the R.C. 121.22(G) exceptions, such as termination of a public employee.

> The Court finds that the Board routinely and presumably knowingly

disregarded the Sunshine Act. The Board was provided written material on the Sunshine Act requirements in February of 2011. Had the Board properly informed itself of what was required, it would not have entered into so many executive sessions that were not permissible exceptions to the Sunshine Act.

Further, the Board's practice of ending executive session and then merely opening the meeting room door, does not comply with the Sunshine Act. The testimony of Victoria Phillips indicates that the Board would adjourn and leave a note for her to record the votes. Defendants' counsel asserts that Phillips was not present for the adjournment and so has no direct knowledge of the adjournment, however, the court finds the testimony illustrative of the Board's failure to resume the public meeting by even summoning the Executive Secretary for a recording of the votes. It appears that the practice was to complete the executive session and adjourn, leave a note, and go home, without re-opening to the public. Although the statute does not outline a specific procedure for re-opening a meeting to the public, the court finds that the regular practice of the Board excluded the public. The Board's action of adjourning their executive sessions by vote was not improper; rather the adjournment of the public meeting shortly thereafter without re-opening to the public is a violation.

On at least two occasions, the Board took votes after adjourning executive session, but without re-opening the meeting to the public. On October [27,] 2011 and January 26, 2012, the Board adopted the Performance Improvement Plan (PIP) and also required Maddox to respond with a "white paper." The PIP was used later to evaluate Maddox in executive sessions, and was ultimately used as a

basis for her termination. The implementation of the PIP was in violation of the Sunshine Act, and any actions on which it was based are also invalid.

(Doc. #102 at 8-9).

{¶ 6}    The trial court summarized the thirty OMA violations it found as follows:

· June to September 2011—Two violations for each meeting held, one for improperly entering executive session and one for not re-opening the meeting to the public, for a total of eight violations. (8)

· October 27, 2011—The same two violations as above, plus the additional violation of voting to implement the PIP without re-opening to the public, for a total of three violations. (3)

· December 1, 2011—Two violations, one for improperly going into executive session and one for not re-opening the meeting to the public. (2)

· January 26, 2012—Three violations, one for improperly entering into executive session, one for failing to re-open the meeting to the public, and one for voting for Maddox to prepare a "white paper" without re-opening to the public. (3)

· February 14, 2012, February 26, 2012, March 26, 2012, April 26, 2012, May 22, 2012, May 31, 2012—Two violations each meeting, one for improperly going into executive session and one for not re-opening the meeting to the public, for a total of twelve violations. (12)

· June 26, 2012—Two violations, one for the improperly entered executive session and one for the invalid vote to terminate Maddox. (2)

(*Id*. at 9-10).

{¶ 7} Based on the foregoing violations, the trial court opined that Maddox's termination on June 26, 2012 was invalid. It again ordered injunctive relief under the OMA. (*Id.* at 10).Thereafter, the Commissioners were substituted as a party defendant, apparently due to a merger of Greene County Children Services into Greene County Job and Family Services, and the trial court held a separate hearing on the damages and back-pay issues. On June 24, 2013, the trial court found Maddox entitled to back pay from June 26, 2012 (the date of her invalid termination) until November 20, 2012 (the date on which the trial court found "the executive director position was extinguished by the merger of CSB with Greene County Job and Family Services"). (Doc. #96 at 2). The trial court then addressed the "stacking" of $500 civil forfeitures for each of the thirty OMA violations it found. It decided to award Maddox only twelve $500 civil forfeitures for the thirty violations. Finally, the trial court found Maddox entitled to reasonable attorney fees under the OMA. After finding the hourly rate reasonable and making various downward adjustments to the $128,069.42 attorney-fee bill, the trial court awarded her fees of $77,604.20. (*Id.* at 7-11). This appeal and cross appeal followed.

{¶ 8} In its first assignment of error, CSB contends the trial court erred in granting Maddox injunctive relief under the OMA and in finding thirty OMA violations. It advances three arguments in support. First, CSB argues that it was not sui juris and, therefore, that the trial court's later substitution of the Commissioners as a party defendant was invalid. Second, CSB asserts that it did not violate the OMA. Third, CSB maintains that Maddox's June 26, 2012 termination was valid because it did not violate the OMA.

{¶ 9} Upon review, we reject the argument that CSB was not sui juris for purposes of Maddox's complaint. CSB relies on R.C. 5153.18(A), which provides that a public children-services agency "shall have the capacity possessed by natural persons *to institute*

*proceedings in any court*." (Emphasis added). CSB points out that this language fails to confer on a children-services agency *the capacity to be sued*. Therefore, CSB argues that it was not sui juris, that the proceedings commenced against it were void, and, as a result, that the Commissioners later could not be substituted as defendants.

{¶ 10}  For present purposes, we need not decide whether CSB was sui juris under R.C. 5153.18(A). We find that the OMA itself made CSB sui juris for purposes of Maddox's lawsuit. Under the OMA, a "public body" includes any agency, authority, or similar decision-making body of any county. R.C. 121.22(B)(1)(a). "A county children services board is an agency of the county [.]" 1995 Ohio Atty Gen. Opinion No. 95-027 at 2-134; *see also Wade v. Bethesda Hospital*, 356 F. Supp. 380, 385 (S.D. Ohio 1973) (recognizing that a county children-services board "is an agent of the county").

{¶ 11}  The OMA provides that a trial court "shall issue an injunction to compel the members of the public body to comply with its provisions." R.C. 121.22(I)(1). Moreover, if a trial court "issues an injunction pursuant to division (I)(1) of [R.C. 121.22], the court shall order the public body that it enjoins to pay a civil forfeiture of five hundred dollars to the party that sought the injunction and shall award to that party all court costs and, subject to reduction as described in division (I)(2) of this section, reasonable attorney's fees." R.C. 121.22(I)(2)(a).

{¶ 12}  In short, we conclude that CSB qualified as a "public body" and that R.C. 121.22 explicitly makes a public body subject to an OMA suit for injunctive relief, civil forfeitures, court costs, and attorney fees. Therefore, for purposes of Maddox's lawsuit against it, CSB was sui juris and the proceedings against it were not void. That being so, we are unpersuaded by CSB's argument that the trial court erred by later substituting the Commissioners into a void proceeding.

**{¶ 13}** We recognize that the Fourth District Court of Appeals reached a contrary conclusion in *Mollette v. Portsmouth City Council*, 169 Ohio App.3d 557, 2006-Ohio-6289, 863 N.E.2d 1092 (4th Dist.). Having reviewed that opinion, however, we find its reasoning unpersuasive and decline to follow it. In *Mollette*, the Fourth District rejected an argument that R.C. 121.22 made a city council sui juris for purposes of an OMA lawsuit. In relevant part, the Fourth District reasoned:

The Mollettes' complaint names Portsmouth City Council as the sole defendant. However, unless a statute specifically authorizes suit against city councils, Portsmouth City Council cannot be sued. * * * In their brief, the Mollettes argue that R.C. 121.22 authorizes suit against city councils for violations of the open-meetings law. They note that the definition of "public body" in R.C. 121.22(B)(1)(a) includes "any legislative authority or board * * * council * * * or similar decision-making body of any * * * municipal corporation." Additionally, they note that in discussing the remedies for a violation of the open-meetings law, R.C. 121.22(I)(2)(a) states that "the court shall order the public body that it enjoins to pay a civil forfeiture of five hundred dollars to the party that sought the injunction." They argue that in order for R.C. 121.22(I)(2)(a) to have any legal effect, the "public body" that is the subject of the injunction and civil forfeiture order must be a party to the action.

There is no language in R.C. 121.22 specifically authorizing suits against city councils. Moreover, the inclusion of city councils within the definition of a "public body" is insufficient to subject city councils to suit. The Mollettes argue that the city council must be a party to the action if it is to be bound by the court's

injunction and civil forfeiture order. However, the same result can be achieved by bringing suit against the individual council members in their official capacity. An injunction and civil forfeiture order against the council members in their official capacity is, for all practical purposes, an injunction and civil forfeiture order against city council.

Furthermore, a review of other statutes reveals that the General Assembly is usually explicit when conferring the ability to sue and be sued upon an entity. * * * Had the General Assembly intended to subject city councils to suit, it could have expressed that intent clearly. However, our review has failed to turn up any statutes authorizing suit against city councils. Additionally, the Mollettes have failed to cite any statutory authority making city councils amenable to suit.

*Id.* at ¶ 16-18.

{¶ 14} We respectfully disagree with the Fourth District's analysis. Although there is no language in the OMA "specifically authorizing suits against city councils," there is language specifically authorizing suits against "public bodies," which include city councils and children-services boards. Moreover, the *Mollette* court declares that "the inclusion of city councils within the definition of a 'public body' is insufficient to subject city councils to suit." It offers no support for this position, which is contradicted by the language of R.C. 121.22. The Fourth District also opines that an OMA suit may be brought against individual council members in their "official capacity" because "[a]n injunction and civil forfeiture order against the council members in their official capacity is, for all practical purposes, an injunction and civil forfeiture order against city council." We agree that an official-capacity suit effectively is a suit against the public body itself. *See, e.g.*, *Range v. Douglas*, 878 F.Supp.2d 869, 875 (S.D.Ohio 2012) ("A

suit against an individual in his or her official capacity is the equivalent of a suit against the governmental entity."). That being so, we fail to see how suing counsel members in their "official capacity" would solve the sui juris problem found by the Fourth District. Finally, the *Mollette* court observes "that the General Assembly is usually explicit when conferring the ability to sue and be sued upon an entity." Again, we agree. Here the General Assembly explicitly conferred the ability to be sued upon public bodies facing OMA claims. Accordingly, we decline to follow *Mollette*. For the reasons set forth above, we conclude that CSB was sui juris for purposes of Maddox's lawsuit.

{¶ 15}   CSB next argues that it did not violate the OMA. As set forth above, the trial court found thirty OMA violations. Most of them involved CSB either entering executive session without sufficiently stating a proper purpose or failing to reopen its meeting to the public after an executive session. The other violations found by the trial court involved CSB improperly taking official action by voting on something in executive session or when the public was excluded.

{¶ 16}   With regard to the sufficiency of its stated purpose for entering executive session, CSB contends the trial court erred in penalizing it for not reciting the precise statutory language. CSB cites *Cincinnati Enquirer v. Hamilton County Comm.*, 1st Dist. Hamilton No. C-010605, 2002-Ohio-2038, and argues that "the key consideration is whether or not the legislature intended to permit such executive sessions, not whether there was a precise statutory recitation." (Appellant-Cross Appellees' brief at 9). CSB also cites *Lawrence v. Edon*, 6th Dist. Williams No. WM-05-001, 2005-Ohio-5883, for the proposition that the OMA does not prohibit "a public body from discussing a public employee's employee evaluations or job performance in executive session." (*Id.*). Finally, CSB challenges the trial court's finding that it violated the OMA by ending executive session and adjourning without reopening its meetings to the public. CSB

asserts that it reopened the meeting-room doors after executive sessions and that the OMA did not obligate it to "call or search for members of the public who may want to be present[.]" (Id.).

{¶ 17}　We begin our analysis of CSB's arguments with a review of the OMA. "Ohio's Open Meetings Act is to be liberally construed to require a public body to take official action and conduct deliberations upon official business in meetings open to the public. R.C. 121.22(A). Public officials may discuss certain sensitive information in a private executive session from which the public is excluded, if particular procedures are followed." (Citations omitted) *State ex rel Young v. Bd. of Edn. Lebanon School Dist.*, 12th Dist. Warren No. CA2012-02-013, 2013-Ohio-1111, ¶ 49. "Specifically, members of a public body may hold an executive session only after a majority of a quorum of the public body determines, by a roll call vote, to hold an executive session and only at a regular or special meeting for the sole purpose of the consideration of specific matters." (Citations omitted). *Id.* Pursuant to R.C. 121.22(G), a public body may conduct an executive session for certain specified reasons. As relevant here, they include (1) considering the appointment, employment, dismissal, discipline, promotion, demotion, or compensation of a public employee or official, or the investigation of charges or complaints against a public employee, and (2) conducting conferences with an attorney for the public body concerning disputes involving the public body that are the subject of pending or imminent court action. "The executive session exceptions contained in R.C. 121.22(G) are to be strictly construed." (Citations omitted) *Id.* at ¶ 50.

{¶ 18}　Based on our review of R.C. 121.22(G) and pertinent case law, we see no error in most of the trial court's findings regarding OMA violations. While a public body may not need to use exact statutory language when stating its purpose for entering executive session, it must make clear which specific statutory purpose applies. *See*, *e.g.*, *State ex rel. Long v. Cardington Village*

*Council*, 92 Ohio St.3d 54, 59, 748 N.E.2d 58, 63 (2001) ("If a public body decides to conduct an executive session for the purpose of considering one or more of the matters listed in R.C. 121.22(G)(1) concerning personnel, the public body must specify in its motion and vote those listed matters that it will discuss in the executive session. * * * By using general terms like 'personnel' and 'personnel and finances' instead of one or more of the specified statutory purposes, respondents violated R.C. 121.22(G)(1)."); *In re Removal of Kuehnle*, 161 Ohio App.3d 399, 2005-Ohio-2373, 830 N.E.2d 1173, ¶ 93 (12 Dist.2005) ("The statute requires a public body to specify, in detail, the stated purpose for holding an executive session, although the law does not require that the specific nature of the matter to be considered be disclosed. The exceptions contained in R.C. 121.22(G) are to be strictly construed."); *Weisbarth v. Geauga Park Dist.*, 11th Dist. Geauga No. 2007-G-2780, 2007-Ohio-6728, ¶ 27 ("Although appellee noted the purpose of going into executive session, i.e., to discuss 'personnel' matters, the statute requires appellee to be more specific by denoting the precise type of 'personnel' matters it would address, such as hiring, discipline, termination, etc."); *State ex rel Young*, *supra*, at ¶ 63 ("If a public body will hold an executive session for the purpose of discussing one or more of the matters listed in R.C. 121.22(G)(1) concerning personnel, the public body must specify in its motion and vote, which of the particular matters listed in subdivision (G)(1) the public body will discuss."); *Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 185 Ohio App.3d 707, 2009-Ohio-6993, 925 N.E.2d 641, ¶ 64 (10th Dist.2009) ("R.C. 121.22(G) lists the seven matters that a public body may consider in executive session. A public body may convene in executive session only after a motion and a vote that specifically identify the permissible topic."); 1988 Ohio Atty. Gen. Opinion No. 88-029 at 15 ("[I]f the public body is going into executive session for the purpose of discussing one or more of the matters listed in R.C. 121.22(G)(1) concerning

personnel, the public body must specify in its motion and vote, which of the particular matters listed in subdivision (G)(1) the public body will discuss.").

{¶ 19}    As set forth above, the trial court found that CSB had violated the OMA multiple times by going into executive session to discuss Maddox's "evaluation." The trial court reasoned that "[e]valuation of a public employee is not an exception outlined in the statute." (Doc. #96 at 5). We agree. Construing the OMA liberally in favor of open meetings and construing the executive-session exceptions narrowly, the trial court correctly found no exception for employee "evaluation." The case upon which CSB relies is not to the contrary. In *Lawrence v. Edon*, 6th Dist. Williams No. WM-05-001, 2005-Ohio-5883, the appellant argued under his first assignment of error that "R.C. 121.22(G) prohibits the holding of an executive session to consider dismissing a public employee or official." *Id.* at ¶ 11. The Sixth District rejected this argument because R.C. 121.22(G)(1) specifically authorizes an executive session to consider the dismissal of a public employee. *Id.* at ¶ 12-13. The *Lawrence* court reasoned that the appellant's termination "resulted from deliberations that were for a purpose specifically authorized in division (G) of R.C. 121.22[.]" *Id.* at ¶ 14. Later in its opinion, the Sixth District referred again to the executive session and opined that "nothing in R.C. 121.22(G) prevents a village council from discussing a village employee's job performance." *Id.* at ¶ 16. The next sentence suggests, however, that this reference to "job performance" was a shorthand reference to the proper stated purpose of the meeting, which was "to consider appellant's 'dismissal [or] discipline.'" *Id.* In any event, we do not necessarily disagree with the Sixth District's statement that the OMA permits discussion of an employee's "job performance" in executive session. Prior to entering into executive session, however the public body must specify the context in which "job performance" will be considered by identifying one of the statutory purposes set forth in R.C. 121.22(G).

{¶ 20} The trial court also found multiple OMA violations based on CSB entering executive session to discuss "upcoming negotiations." The trial court reasoned that this stated purpose was insufficient to satisfy R.C. 121.22(G). (Doc. #96 at 6). We agree. The trial court speculated that the mention of "upcoming negotiations" may have been a reference to a "proposed merger with Greene County Department of Job and Family Services, which would qualify as a bargaining exception under R.C. 121.22(G)(4)."[2] In any event, a non-specific reference to "upcoming negotiations" is not a proper statutory purpose for executive session.

{¶ 21} The trial court found multiple OMA violations for entering executive session to discuss "personnel matters" or "personnel issues." (Doc. #96 at 6). Again, we agree. Based on the case law cited above, a non-specific reference to "personnel matters" or "personnel issues" does not satisfy R.C. 121.22(G).

{¶ 22} We believe the trial court found two OMA violations, however, that do not exist. The trial court found an OMA violation when CSB entered executive session on May 22, 2012 to discuss "threatened or imminent litigation." (Doc. #102 at 5, 10; Doc. #96 at 6). The trial court reasoned that no litigation was threatened or imminent at that time. We disagree. Under R.C. 121.22(G)(3), a proper purpose for an executive session is a conference "with an attorney for the public body concerning disputes involving the public body that are the subject of *pending or imminent* court action." (Emphasis added). Here the record contains a May 17, 2012 letter from Maddox's counsel to CSB expressly threatening litigation if an agreeable settlement is not reached. (*See* Verified Complaint, Doc. #1 at Exh. A). CSB entered executive session five days

---

[2] Parenthetically, we note that R.C. 121.22(G)(4) authorizes executive session for "[p]reparing for, conducting, or reviewing negotiations or bargaining sessions with public employees concerning their compensation or other terms and conditions of their employment."

later to discuss "threatened or imminent litigation." We see no OMA violation. Maddox's threat of litigation reasonably made a lawsuit appear imminent. *Cf. Warthman v. Genoa Twp. Bd. of Trustees*, 5th Dist. Delaware No. 10CAH040034, 2011-Ohio-1775, ¶ 104 (finding that a board properly entered executive session regarding imminent court action where a lawsuit had been threatened). In fact, Maddox actually filed her lawsuit against CSB on July 10, 2012.

{¶ 23} The trial court also found an OMA violation when CSB entered executive session on June 26, 2012 to consider "the dismissal or discipline of a public employee." (Doc. #102 at 5, 10). This stated purpose is almost a verbatim recitation of R.C. 121.22(G)(1), and CSB did not violate the OMA by going into executive session for this purpose.

{¶ 24} CSB's only other argument regarding the OMA violations found by the trial court concerns how it ended executive sessions and adjourned meetings. The record reflects that CSB had one room where it held both its regular and executive sessions. When CSB entered executive session, it required members of the public to leave the room and closed the door. When executive session ended, the door was opened. CSB claims its meetings then were adjourned in public. Apparently, only CSB members ordinarily were present when adjournment occurred.

{¶ 25} The trial court found that after executive session and prior to adjournment CSB's meetings were not re-opened to the public. The trial court concluded that failing to re-open the meetings to the public violated the OMA. The record supports the trial court's resolution of this issue. With the exception of executive sessions, the OMA requires all meetings of a public body to be open to the public at all times. R.C. 121.22(C). Moreover, unless the subject matter is specifically excepted, the OMA requires public bodies to take official action and to conduct deliberations in open meetings. R.C. 121.22(A). It follows that a motion and vote to adjourn a public meeting after an executive session has ended must occur in public and must be open to the

public. *Cf.* Baldwin's Ohio Practice, Local Government Law—Township, §9.4 Executive Session ("To hold an executive session, the board must commence a public meeting, go into executive session and exclude the public, and, at the end of the executive session, re-open the meeting to the public and adjourn.").

{¶ 26} Here the record supports a finding that CSB ended its executive sessions, opened the door to the room, and adjourned its meetings before any members of the public could re-enter. Even CSB executive secretary Victoria Phillips was not able to enter the room before meetings were adjourned and notes were left for her to record the vote. The trial court reasonably found this fact "illustrative of the Board's failure to resume the public meeting[.]" (Doc. #102 at 9). On another occasion a large group of people waited outside to re-enter after an executive session. Upon seeing the door open, they went back inside the room and discovered that the meeting already had ended. (Hearing Tr. at 61-62). We agree with CSB that the OMA does not compel it to scour the halls searching for members of the public. But if CSB forces people to vacate its room for executive sessions, it must give those people a reasonable opportunity to re-enter after the executive sessions have ended and before the meetings are adjourned.

{¶ 27} The final issue raised under CSB's first assignment of error concerns the validity of Maddox's June 26, 2012 termination. In finding her termination invalid, the trial court reasoned:

> The court also finds that the June 26, 2012 action to terminate Maddox was invalid. A violation of the Sunshine Act cannot be cured when discussions and deliberations were held in an improperly convened executive session. Although the public was permitted at a later meeting to comment on the termination, the testimony of Barbara Burson and Randy Roach indicates that the

decision to terminate Maddox was reached in April, and the June meeting was intended to reconfirm the vote in what the Board believed was the proper statutory method. The purpose for the executive session stated at the June 26, 2012 meeting, to discuss "personnel issues relating to the Executive Director position" also does not comply with the Sunshine Act, as it makes no reference to the R.C. 121.22(G) exceptions, such as termination of a public employee.

(Doc. #102 at 8).

{¶ 28} In another ruling, the trial court provided a similar explanation for finding Maddox's June 26, 2012 termination invalid. It reasoned:

In regard to the June 26, 2012 meeting, this court found two violations. * * * [T]he purpose for the executive session, to discuss the dismissal of a public employee, was proper under the statute, however, the vote, which was based on no new deliberations, appears to have been a re-iteration of the April 26, 2012 action to force resignation or terminate Maddox. The court finds that an executive session at this point was likely an effort to conceal the motivations of the board from the public prior to taking the vote. * * *

(Doc. #96 at 6).

{¶ 29} CSB disputes the trial court's findings regarding Maddox's termination on June 26, 2012. It first asserts that the stated purpose for the executive session on that date was proper. We agree. As noted above, the stated purpose for the June 26, 2012 executive session was to consider "the dismissal or discipline of a public employee." (Doc. #102 at 5, 10). This purpose

tracked R.C. 121.22(G)(1) and constituted a valid reason for an executive session.[3]

{¶ 30}    The more difficult issue is whether CSB's vote to terminate Maddox on June 26, 2012 was invalid because it was based on prior discussions and deliberations that had occurred in violation of the OMA. On this issue, CSB argues that Maddox was merely placed on administrative leave on April 26, 2012. Even if that action occurred in violation of the OMA, CSB asserts that a prior OMA violation does not preclude a public body from ever taking action against an employee. CSB also claims "[t]here is no requirement in the OMA that additional facts be considered or additional discussion occur prior to the termination in open session." Finally, CSB maintains that additional deliberations did occur in any event.

{¶ 31}    Upon review, we agree with CSB that Maddox was not terminated on April 26, 2012.[4] The record reflects that she was placed on paid administrative leave on that date. We also agree that an OMA violation does not preclude a public body from ever discharging or disciplining an employee. Such a rule effectively would give an employee lifetime employment. The real issue, however, is not whether a public body *ever* may terminate an employee after an OMA violation. Rather, the issue is what a public body must do to fire an employee after an OMA violation. We find guidance in R.C. 121.22(H), which provides:

---

[3]Parenthetically, we note that in two separate rulings, the trial court appears to have reached conflicting conclusions regarding the adequacy of the purpose for the June 26, 2012 executive session. On one occasion, the trial court opined that the purpose for the June 26, 2012 executive session "was proper under the statute." (Doc. #96 at 6). On another occasion, the trial court concluded that "[t]he purpose for the executive session stated at the June 26, 2012 meeting * * * [did] not comply with the Sunshine Act[.]" (Doc. #102 at 8). In our analysis above, we determined that stated purpose of the June 26, 2012 executive session did satisfy R.C. 121.22(G).

[4]As a practical matter, it matters not whether the employment action that occurred on April 26, 2012 was Maddox's termination or her placement on administrative leave. In either case, that employment action was invalid—a conclusion CSB does not appear to dispute seriously—because the vote to take it occurred in executive session, which violated the OMA.

A resolution, rule, or formal action of any kind is invalid unless adopted in an open meeting of the public body. *A resolution, rule, or formal action adopted in an open meeting that results from deliberations in a meeting not open to the public is invalid unless the deliberations were for a purpose specifically authorized in division (G) or (J) of this section and conducted at an executive session held in compliance with this section.*

(Emphasis added).

**{¶ 32}** Here CSB took formal action against Maddox by firing her in an open meeting on June 26, 2012. In our analysis above, we concluded that the June 26, 2012 executive session preceding the vote to fire Maddox was permitted because it was held for a proper purpose, namely to consider "the dismissal or discipline of a public employee." The vote that followed the executive session was held in open session in a meeting that was open to the public. (*See* Hearing Exh. C, June 26, 2012 CSB meeting minutes at p. 3). Therefore, neither the June 26, 2012 executive session nor the vote that followed violated the OMA. Pursuant to R.C. 121.22(H), however, the critical issue is whether the vote taken in the June 26, 2012 open session *resulted from* prior deliberations in executive sessions that violated R.C. 121.22(G). If so, the formal action taken against Maddox on June 26, 2012 was invalid.

**{¶ 33}** In the proceedings below, the trial court found "that each of the executive sessions held leading up to the termination of Maddox [was] held for an improper purpose, whether that purpose was for 'personnel matters' or other stated purposes, none of which were enumerated exceptions under R.C. 121.22(G)." (Doc. #102 at 8). In our analysis above, we agreed with this conclusion. The record reveals that Maddox's job performance  and possible termination were deliberated during these improper executive sessions. Ultimately, she was

placed on administrative leave on April 26, 2012 during another improper executive session that included further deliberation regarding her employment. On May 31, 2012, CSB held yet another improper executive session to deliberate "personnel issues" relating to Maddox's position.

**{¶ 34}** In its brief, CSB argues that the May 31, 2012 meeting also included proper open-session deliberations about Maddox's job. Specifically, it notes that members of the public and CSB members spoke about whether Maddox should keep her job. CSB points out that prior to the June 26, 2012 vote, two members commented in open session about Maddox's employment. In addition, CSB stresses member Barbara Burson's testimony that she considered additional information about a missing child when voting on June 26, 2012 to fire Maddox. As a result, CSB insists that additional proper deliberation occurred prior to Maddox's termination. Therefore, it argues that her discharge did not violate the OMA notwithstanding any prior violations.

**{¶ 35}** Upon review, we find the foregoing argument is not persuasive. Pursuant to R.C. 121.22(H), the issue is whether the June 26, 2012 vote resulted from deliberations in prior executive sessions that violated R.C. 121.22(G). It is not enough for CSB to point to some "new" or "additional" deliberations if the employment action it took against Maddox still resulted from prior improper deliberations. We recognize the inherent difficultly in determining precisely what information motivated each CSB member who voted to fire Maddox on June 26, 2012. Nevertheless, based on the evidence before it, the trial court could have inferred that CSB voted to fire Maddox on that date largely as a result of months of improper deliberations that had occurred in executive sessions held in violation of the OMA. The trial court's factual conclusion that "the decision to terminate Maddox was reached in April" is not inconsistent with the evidence and it is a finding to which we defer. The fact that a few people spoke during open

sessions on May 31, 2012 and June 26, 2012 certainly did not compel the trial court to reach a contrary conclusion. Indeed, based on our own review of the record, it appears to us that the bulk of deliberation and decision-making regarding Maddox's discharge occurred in prior executive sessions that violated R.C. 121.22(G). Accordingly, the record supports the trial court's finding that the vote taken in the June 26, 2012 open session resulted from those improper deliberations. Thus, Maddox's June 26, 2012 termination was invalid.

{¶ 36}  Contrary to CSB's argument, this does not mean Maddox enjoyed employment for life. We believe this argument misses the point. Our holding means that before firing Maddox CSB was required to re-deliberate—either in open sessions or in executive sessions held in compliance with R.C. 121.22(G)—at least enough to support a  finding that its discharge decision did not result from prior improper deliberations. *See*, *e.g.*, R.C. 121.22(H); *Danis Montco Landfill Co. v. Jefferson Twp. Zoning Comm.*, 85 Ohio App.3d 494, 501, 620 N.E.2d 140, 145 (2d Dist.1993) (citing *State ex rel. Delph v. Barr*, 44 Ohio St.3d 77, 541 N.E.2d 59 (1989), and recognizing that a public body must "start its decision-making process over with regard to what was illegally deliberated or decided in a closed meeting"); *Wheeling Corp. v. Columbus & Ohio River RR. Co.*, 147 Ohio App.3d 460, 2001-Ohio-8751, 771 N.E.2d 263, ¶88-90 (10th Dist.2001). This conclusion flows from R.C. 121.22(H), which "invalidates any formal action that *results from deliberations* conducted in private." (Emphasis added) *Delph* at 81.

{¶ 37}  Based on the foregoing analysis, we sustain in part and overrule in part CSB's first assignment of error. The assignment of error is sustained insofar as the trial court erred in finding OMA violations when CSB entered executive session to discuss "threatened or imminent litigation" and to consider "the dismissal or discipline of a public employee." In all other

respects, the first assignment of error is overruled.

{¶ 38} In its second assignment of error, CSB claims the trial court erred in finding liability for multiple forfeitures, attorney fees, and Maddox's back pay and benefits from June 26, 2012 to November 20, 2012. CSB advances three arguments in support. First, it reiterates its contention that it was not sui juris and, therefore, that the trial court's later substitution of the Commissioners as a party defendant was invalid, rendering the entire final judgment void. Second, CSB contends a single $500 forfeiture should have been assessed because the OMA violations were "repetitive and technical or procedural." Third, CSB maintains that the $77,604.20 attorney-fee award should be vacated or further reduced for various reasons.

{¶ 39} We quickly may dispose of the first argument. For the reasons set forth above, CSB was sui juris and the proceedings against it were not void. Therefore, the trial court did not improperly substitute the Commissioners into a void proceeding or enter a void final judgment.

{¶ 40} We also reject the argument about Maddox being entitled to only one $500 forfeiture. The OMA provides that "[u]pon proof of a violation * * * of this section in an action brought by any person, the court of common pleas shall issue an injunction to compel the members of the public body to comply with its provisions." R.C. 121.22(I)(1). The OMA further provides that "[i]f the court of common pleas issues an injunction pursuant to division (I)(1) of this section, the court shall order the public body that it enjoins to pay a civil forfeiture of five hundred dollars * * *." R.C. 121.22(I)(2).

{¶ 41} On its face, R.C. 121.22(I) requires a trial court to issue an injunction and a $500 forfeiture for a violation of the OMA. The statute makes these remedies mandatory, not permissive. *Vermilion Teachers' Assn. v. Vermilion Local School Dist. Bd. of Edn.*, 98 Ohio

App.3d 524, 532, 648 N.E.2d 1384, 1389 (6th Dist.1994) ("Once a violation of the Sunshine Law is found, the remedy provisions of R.C. 121.22(I) are mandatory[.]"). The question is whether a trial court may, or even must, impose multiple $500 forfeitures for repeated violations. Here the trial court found thirty OMA violations. It grouped similar repeated violations together, however, and assessed twelve $500 forfeitures for the violations if found.

{¶ 42} In arguing for a single $500 forfeiture, or at least for a reduction in the number of forfeitures awarded, CSB relies on this court's trilogy of opinions in *Doran v. Northmont Bd. of Edn.*, 147 Ohio App.3d 268, 2002-Ohio-386, 770 N.E.2d 92 (2d Dist.) (*Doran I*), *Doran v. Northmont Bd. of Edn.*, 153 Ohio App.3d 499, 2003-Ohio-4084, 794 N.E.2d 760 (2d Dist.) (*Doran II*), and *Doran v. Northmont Bd. of Edn.*, 2d Dist. Montgomery No. 19956, 2003-Ohio-7097 *(Doran III)*. CSB also relies on *Weisbarth v. Geauga Park Dist.*, 11th Dist. Geauga No. 2007-G-2780, 2007-Ohio-6728. Conversely, in her first assignment of error on cross appeal, Maddox contends R.C. 121.22(I) and the nature of the OMA violations at issue warranted separate $500 civil forfeitures for each violation. Therefore, she claims the trial court erred in assessing only twelve $500 forfeitures.

{¶ 43} As a preliminary matter, we find CSB's reliance on the *Doran* opinions misplaced. In *Doran I*, this court held that a school board had violated R.C. 121.22(F) by failing to establish, by rule, a reasonable method of informing the public of the time, place, and purpose of its meetings. Despite this "technical" violation, we declined to invalidate actions taken by the board at a meeting. In *Doran II*, this court held that the trial court properly had issued a statutory injunction to enjoin the board from committing future violations of R.C. 121.22(F). In *Doran III*, this court rejected the appellant's argument that he was entitled to a separate $500 civil forfeiture for each time the school board held a meeting without the required public-notice rule in place.

We reasoned:

> * * * [T]he Board's failure to adopt such rule constituted a single violation of the Sunshine Law, regardless of how long it lacked the rule or how many "open meetings" it conducted in the absence of a formal public-notice rule. As the trial court correctly observed, "it was the Board's failure to establish a rule, not the meetings that were conducted, which violated O.R.C. 121.22(F)." Given that the trial court previously had imposed the required sanctions for this violation, Doran was not entitled to additional statutory injunctions or civil forfeiture penalties.

*Doran III* at ¶ 14.

**{¶ 44}** Unlike *Doran*, where this court found only one OMA violation, the trial court below found thirty violations (which we have reduced to twenty-eight in our analysis above). In the *Doran* opinions, this court had no occasion to decide whether multiple forfeitures were warranted for multiple violations. The other case cited by CSB, *Weisbarth*, is more analogous to the present situation. In *Weisbarth*, the appellant sought a separate $500 civil forfeiture for each of twenty meetings at which a public body failed to recite a sufficient statutory purpose for entering executive session. Relying largely on *Doran*, the *Weisbarth* court rejected the appellant's argument. It reasoned:

> Here, as in *Doran*, appellee was in violation of the statute due to its failure to fully specify its basis for entering executive session; however, appellant did not allege appellee stood in violation of R.C. 121.22 as a result of actions taken during executive session. In other words, no allegations were made and no evidence was offered indicating appellee acted improperly due to formal actions taken once it entered executive session. The only violation alleged involved

appellee's failure to sufficiently elucidate the specific statutory purpose for entering executive session. In line with *Doran*, we therefore hold appellee's "technical" violation entitled appellant to only one statutory injunction and one civil forfeiture.

*Weisbarth* at ¶ 30.

**{¶ 45}** Despite the Eleventh District's citation to *Doran*, we are not convinced that it is analogous to *Weisbarth* or the present case. As explained above, *Doran* involved *one* OMA violation for failing to establish a public-notice rule as required by the statute. Like the present case, Weisbarth involved *multiple* OMA violations for failing to recite a specific statutory purpose for entering executive session. Because *Doran* did not even involve multiple OMA violations, it is not persuasive authority for declining to impose multiple forfeitures for multiple violations. Nevertheless, we do agree with the ultimate conclusion reached by the Eleventh District in *Weisbarth*.

**{¶ 46}** As noted above, R.C. 121.22(I) requires a trial court to issue an injunction and a $500 forfeiture for a violation of the OMA. Here the trial court reasonably concluded that CSB had "violated" the OMA by (1) entering executive session without sufficiently stating a proper purpose, (2) failing to reopen its meetings to the public after an executive session, and (3) conducting improper votes. We are unconvinced that the trial court necessarily was required to issue a separate $500 civil forfeiture for each occasion on which CSB committed one of the foregoing violations, particularly in the absence of evidence that CSB knowingly or flagrantly repeated the same violations.[5] Rather, under the circumstances before us, we believe the trial

---

[5] In one of its rulings below, the trial court opined that CSB "routinely and presumably knowingly disregarded the Sunshine Act."

court reasonably grouped some violations by type and assessed a $500 forfeiture for each type of violation.[6]

**{¶ 47}** In support of its decision to award Maddox twelve $500 civil forfeitures, the trial court reasoned:

> Eleven (11) of the thirteen (13) violations of the Sunshine Act for failure to properly re-open meetings to the pubic are technical in nature. These violations involve CSB's failure to inform the public of the end of the executive session, adjourning the meeting, and opening the door. No additional actions by the board are known to have been taken outside the public purview. These eleven (11) violations will not stack and are assessed one $500.00 civil forfeiture.
>
> At two of these meetings, January 26 and June 26, CSB took votes after the adjournment of executive session, and outside the public purview. The Sunshine Act requires official actions such as votes to be taken in open session. These votes are not technical in nature as the public was denied notice of the official action taking place by its exclusion. A $500.00 civil forfeiture is assessed for each of these violations.

---

(Doc. #102 at 8). We do not believe the evidence supports a finding that CSB knowingly disregarded the OMA. In support of its conclusion, the trial court noted that CSB had been "provided written material on the Sunshine Act requirements in February of 2011." (Id.). The trial court presumably was referring to a lengthy treatise published by the Ohio Attorney General's office. The trial court reasoned that "[h]ad the Board properly informed itself of what was required, it would not have entered into so many executive sessions that were not permissible exceptions to the Sunshine Act." (*Id.*). This reasoning supports a finding that CSB was ill informed and perhaps negligent in its duties, but it does not support a finding that CSB "knowingly disregarded the Sunshine Act."

[6] *But see Manogg v. Stickle*, 5th Dist. Licking No. 98CA00102, 1999 WL 173275 (March 15, 1999); *Specht v. Finnegan*, 149 Ohio App.3d 201, 2002-Ohio-4660, 776 N.E.2d 564, ¶ 37-39 (6th Dist.) (following *Manogg* and upholding multiple forfeitures for repeated OMA violations).

Five (5) violations were found for the Board's entering Executive Session for the purpose of discussing the "Executive Director's Evaluation." * * *

At the first of these five (5) meetings, the Executive Director's evaluation was not yet complete, and was presumably a matter of discussion at each of these executive sessions. Evaluation of a public employee is not an exception outlined in the statute. Exceptions involve promotion, demotions, and compensation, which are all related to how a public body would handle an employee whose evaluation is complete. The Board voted on January 26, 2012 to have Maddox prepare a "white paper" further demonstrating that the evaluation was ongoing. Further, the public could not be put on notice of what action the Board was taking in regard to the Executive Director position, as no votes were taken on the record. The purpose for the executive sessions is not one of the exceptions under R.C. 121.22(G) and a $500.00 civil forfeiture is assessed for each of these violations.

Four (4) violations were found when the board entered into executive session to discuss "upcoming negotiations." The Board is presumed to have been discussing the proposed merger with Greene County Department of Job and Family Services, which would qualify as a bargaining exception under R.C. 121.22(G)(4). Although the purpose stated did not adequately place the public on notice, such purpose itself was proper. The violations are technical in nature and one civil forfeiture of $500.00 is assessed for all four.

In regard to the executive session entered into "for the purpose of discussing litigation," one civil forfeiture is assessed. At the time the executive session was held, no litigation was pending or imminent. An executive session is

proper when there is pending or imminent litigation, however, no litigation was threatened or pending at the time. Accordingly, one $500.00 civil forfeiture is assessed.

The four violations for going into executive session to discuss "personnel matters" are assessed one civil forfeiture as being technical in nature. It appears that the Board intended at each of those meetings to discuss terminating Maddox, an accepted purpose under the statute. The May 31, 2012 executive session was also in regard to dismissal of Maddox, and is considered technical. Accordingly, one civil forfeiture is assessed.

The vote ordering Maddox to prepare a "white paper" is not assessed an additional forfeiture, as the civil forfeiture for taking a vote without re-opening the meeting has already addressed this violation. An additional civil forfeiture would be duplicative.

In regard to the June 26, 2012 meeting, this court found two violations. One civil forfeiture is assessed, as the purpose for the executive session, to discuss the dismissal of a public employee, was proper under the statute, however, the vote, which was based on no new deliberations, appears to have been a re-iteration of the April 26, 2012 action to force resignation or terminate Maddox. The court finds that an executive session at this point was likely an effort to conceal the motivations of the board from the public prior to taking the vote. One civil forfeiture is assessed.

Having addressed all of the violations, this court assesses twelve (12) $500 civil forfeitures for violations of R.C. 121.22, for a total of $6000.00.

(Doc. #96 at 4-7).

{¶ 48} With two exceptions, we see no basis for altering the trial court's analysis of the various civil forfeitures it ordered. The first exception concerns the $500 civil forfeiture for CSB entering executive session on May 22, 2012 to discuss pending or imminent litigation. In our analysis above, we found no OMA violation based on that act. Therefore, one of the forfeitures shall be vacated. Although we also found no OMA violation based on CSB entering executive session on June 26, 2012 to to consider "the dismissal or discipline of a public employee," the trial court's civil-forfeiture ruling ultimately recognized that this purpose was "proper" and did not assess a separate forfeiture for it.

{¶ 49} The second exception concerns the trial court's assessment of five separate forfeitures for entering executive session five times to discuss Maddox's "evaluation." The trial court found that this was not a proper purpose for an executive session under R.C. 121.22(G). In our analysis above, we agreed. To be consistent with the trial court's treatment of the other forfeitures, however, we see no reason why this type of violation, which was repeated five times, warrants five separate forfeitures. We agree with CSB that only one forfeiture was warranted.

{¶ 50} With regard to the other forfeitures at issue, we believe the trial court properly awarded one $500 forfeiture for eleven acts of failing to re-open meetings after executive sessions. Although exclusion of the public occurred multiple times, the same violation was repeated. The trial court did not err, however, in treating the two instances differently where CSB voted after an executive session without giving the public an adequate opportunity to re-enter the room.[7] We also see no error in the trial court's assessment of a single $500 forfeiture for four

---

[7] In its ruling, the trial court identified the dates of these votes as "January 26 and June 26." (Doc. #96 at 4). We note, however, that

repeated acts of entering executive session to discuss "upcoming negotiations." Again, these executive sessions involved the same OMA violation being repeated. We reach the same conclusion regarding the imposition of a single forfeiture for entering executive session four times to discuss "personnel matters."

{¶ 51} Based on the foregoing reasoning, we find that the trial court should have assessed seven $500 civil forfeitures rather than twelve.[8] Accordingly, we will sustain CSB's second assignment of error in part. Maddox's first assignment of error on cross appeal, which challenges the trial court's failure to award thirty separate forfeitures, is overruled.

{¶ 52} In a final argument under its second assignment of error, CSB challenges the trial court's $77,604.20 attorney-fee award. It asserts that attorney fees should have been denied or further reduced. Conversely, in her third assignment of error on cross appeal, Maddox contends the trial court erred in not awarding her more attorney fees. She claims the trial court should have awarded her the entire amount she requested.

{¶ 53} The attorney-fee issue is governed by R.C. 121.22(I)(2), which provides that "[i]f the court of common pleas issues an injunction pursuant to division (I)(1) of this section, the court shall order the public body that it enjoins to pay * * * reasonable attorney's fees." Under the statute, a trial court has discretion to reduce the attorney fees awarded upon a finding that the

the June 26, 2012 vote occurred in a public session with the public present. (Doc. #102 at 5-6; Hearing Exh. C, June 26, 2012 CSB meeting minutes at p. 3). It appears that the correct dates of the improper votes may have been October 27, 2011 and January 26, 2012. (Doc. #102, July 12, 2013, Nunc Pro Tunc Amended Decision and Order at 9 ("On at least two occasions, the Board took votes after adjourning executive session, but without re-opening the meeting to the public. On October [27,] 2011 and January 26, 2012, the Board adopted the Performance Improvement Plan (PIP) and also required Maddox to respond with a 'white paper.'").

[8] Specifically, the trial court erred in imposing a forfeiture for the "threatened or imminent litigation" executive session. It also should have assessed one forfeiture, rather than five, for entering executive session to discuss Maddox's "evaluation."

public body, being well informed, reasonably believed it was not violating R.C. 121.22 and that its conduct served public policy. We review an attorney-fee award under R.C. 121.22(I) for an abuse of discretion. *Specht* at ¶ 42 ("Both the Ohio Public Records Act and the Open Meeting Act permit a trial court, in its discretion, to award a prevailing plaintiff attorney fees.* * * Matters within a court's discretion will not be disturbed on appeal absent an abuse of that discretion."). "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *AAAA Enterprises, Inc. v. River Place Community Redevelopment*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary. *Id.* A decision is unreasonable if there is no sound reasoning process that would support it. *Id.*

{¶ 54} CSB raises several issues in support of its argument for eliminating or further reducing the attorney-fee award. The first concerns "block billing" or aggregating the performance of multiple tasks in one billing entry. CSB contends Maddox's counsel engaged in extensive block billing. CSB argues that the trial court improperly estimated the time spent on each task without having sufficient evidence to do so. CSB also asserts that attorney fees should have been denied or further reduced based on Maddox's failure to submit a written fee agreement and based on her counsel's "apparent unfamiliarity" with OMA cases. CSB next claims Maddox should have recovered only those attorney fees related to the trial court's issuance of injunctive relief. Finally, CSB maintains that the attorney-fee award should have been reduced further because it reasonably believed its actions complied with the OMA.

{¶ 55} For her part, Maddox contends the trial court erred in reducing her attorney-fee bill by $22,232.50 to account for "matters unrelated to the Sunshine Law claims." She also

challenges reductions of $12,103.25 and $8,611 based on a finding that the participation of two attorneys was not required. Finally, Maddox claims the trial court erred in reducing her attorney-fee award another five percent, or $6,403.47, for no apparent reason.

{¶ 56}   After determining that an award of attorney fees was proper, the trial court made the following findings:

The court heard expert testimony regarding the reasonableness of the submitted attorneys' fees from Gary Leppla, and has also had time to review the bills provided by Plaintiff's counsel. As a threshold matter, the rates  charged by counsel of $275.00 and $240.00 are reasonable rates for the geographic area. The court also acknowledges the large amount of time required to prepare for litigation of this type, and the need for expeditious work. At the time of the hearing, the bill submitted had reached $128,069.42.

That said, the court has had to review the submitted bills line by line. Due to block billing practices, the court has had, at times, to estimate the reasonable time for certain tasks performed, since most entries contain multiple tasks. The attorney fees are subject to the following reductions:

· The award shall be reduced by $22,232.50, which Plaintiff's counsel acknowledged were for matters unrelated to the Sunshine Law claims.

·  The   award   shall   be   reduced   by   $12,103.25   for   intra-office communications between attorneys Folkerth and Courtney, including e-mails, telephone conferences, and consultations with each other.

· The award shall be reduced by $8,611.00 for conferences with Plaintiff when both attorneys were present and both billed for the time. The majority of

these communications were updates on the status of the case or information gathering communications, or "case strategy" communications not requiring the participation or presence of both attorneys.

· The award shall be reduced by $1,115.00 for docketing and administrative scheduling tasks.

· Finally, the court finds the award further reduced by 5% of the requested fee for an additional adjustment for necessary and reasonable time spent in the amount of $6,403.47.

Therefore the court upon review of the attorneys' fees submitted, and subject to the above referenced adjustments, awards attorneys' fees totaling $77,604.20 to Plaintiff.

(Doc. #96 at 9-10).

{¶ 57} With regard to CSB's arguments, we are unpersuaded that the trial court was required to deny attorney fees altogether for billing entries that involved block billing. Although entries listed multiple activities performed during a block of time, in most instances all or a majority of those activities pertained to OMA claims. Maddox's expert, attorney Gary Leppla, testified that he had no problem "understanding from the documents provided to [him] what the activities were." (Doc. #89, May 13, 2013 Tr. at 15). The trial court itself indicated that, due to block billing, it had "estimate[d] the reasonable time for certain tasks performed" and had reduced Maddox's fee request accordingly. We believe the trial court acted within its discretion in its treatment of the block-billing issue.

{¶ 58} We are equally unpersuaded by CSB's claims about a written fee agreement not being admitted into evidence and about opposing counsel's alleged unfamiliarity with OMA law.

With regard to the former issue, we are unconvinced that Maddox's failure to place a written fee agreement into evidence obligated the trial court to deny attorney fees or to make a further reduction. As for Maddox's counsel's handling of the OMA claims, the evidence does not establish that unfamiliarity with the law resulted in excessive time being billed. We note too that Maddox's counsel has largely prevailed on the OMA claims in the trial court and now on appeal.

{¶ 59} We also reject CSB's claim regarding attorney fees and injunctive relief. CSB notes that the OMA provides for attorney fees when a plaintiff obtains an injunction. It argues that the trial court only granted injunctive relief with regard to Maddox's placement on administrative leave on April 26, 2012 and her termination on June 26, 2012. According to CSB, the trial court did not enter injunctive relief with regard to OMA violations not involving these employment actions. Therefore, CSB argues that attorney fees were not warranted in connection with any other violations. In support, it reasons:

> Under the plain language of [R.C. 121.22(I)], a plaintiff is entitled to recover attorneys' fees and a civil forfeiture when the Court enters injunctive relief as to the violation. In this case, the Court voided the action of CSB in terminating Maddox, resulting in her reinstatement and granted an injunction directing the CSB to continue her salary and benefits. Accordingly, Maddox is entitled to recover, at most, attorneys' fees related to the single injunction issued in this case restoring her salary based upon the OMA violation at the April 26, 2012 meeting, and the court's finding that the CSB's June 26, 2012 termination of Maddox was legally ineffective. Because the trial court did not issue an injunction related to the other alleged violations, an award of attorneys' fees in connection with those violations was improper.

(Appellant-Cross Appellees' brief at 23).

**{¶ 60}** We find the foregoing argument to be without merit. Upon proof of an OMA violation, "the court of common pleas shall issue an injunction[.]" R.C. 121.22(I)(1). Furthermore, "[i]f the court of common pleas issues an injunction * * *, the court shall order the public body that it enjoins to pay * * * reasonable attorney's fees." R.C. 121.22(I)(2)(a). Although attorney fees are subject to possible reduction or elimination, the OMA is structured such that an injunction follows a violation and attorney fees follow an injunction. The trial court found thirty OMA violations, a number that we have reduced to twenty-eight. On its face, the OMA obligated the trial court to issue an injunction for each violation. *Vermilion Teachers' Assn.* at 532 ("Once a violation of the Sunshine Law is found, the remedy provisions of R.C. 121.22(I) are mandatory[.]"). The trial court itself recognized that fact, noting that "[i]f a violation is shown, the court must issue an injunction compelling the public body to comply with the provisions of R.C. 121.22." (Doc. #102 at 6-7). Although the trial court did not delineate thirty separate and distinct injunctions, we believe its grant of injunctive relief to Maddox reasonably, and necessarily, encompassed each of the violations it found. Therefore, we are unpersuaded by CSB's argument that Maddox was not entitled to attorney fees for most of the violations because the trial court never enjoined them.

**{¶ 61}** Finally, we reject CSB's argument that attorney fees should have been reduced further because it reasonably believed it had complied with the OMA. This argument implicates R.C. 121.22(I)(2)(a), which authorizes reducing attorney fees if a trial court finds, in its discretion, that a "well informed" public body reasonably would have believed (1) that it was not violating the OMA and (2) that its conduct served public policy. The trial court did not make these findings, and its failure to do so did not constitute an abuse of discretion.

{¶ 62}  As set forth above, most of the OMA violations at issue involved CSB either entering executive session without sufficiently stating a proper purpose or failing to reopen its meeting to the public after an executive session. The other violations involved CSB improperly taking official action by voting on something in executive session or when the public was excluded. The trial court reasonably could have concluded that a well informed public body would have known that it must be specific when giving a reason for executive session and that it cannot vote on issues in executive session or with the public excluded. The trial court also reasonably could have concluded that a well informed public body would not have believed that ending executive sessions and adjourning meetings before the public could re-enter the meeting room did not serve pubic policy.

{¶ 63}  With regard to Maddox's attorney-fee arguments, however, we do see one error in the trial court's ruling. Maddox first claims the trial court erred in reducing her attorney-fee bill by $22,232.50 to account for "matters unrelated to the Sunshine Law claims." She argues that her attorney already had reduced the bill to account for these unrelated matters. We agree. At the attorney-fee hearing, Maddox's attorney John Folkerth testified as follows regarding the $22,232.50 reduction:

> Alright, for May through December of 2012 identified unrelated fees in the amount of $11,027.50; for January through March of 2013 identified $5,930 of unrelated fees; for April 2013 identified $5,275 of unrelated fees *for a total amount of $22,232.50 in unrelated fees*; also identified total expenses of $5,199.42 less an unrelated expense of $45 for a total of $5,154.42 of expenses. *I took fees and expenses of $150,346.92 and subtracted from that the unrelated fees and the unrelated expenses to come to $128,069.42 of fees and expenses expended*

*on litigating these Sunshine Act issues.*

(Emphasis added) (Doc. #89, May 13, 2013 Tr. at 43).

**{¶ 64}** In its ruling, the trial court stated that "[a]t the time of the hearing, the [attorney-fee] bill submitted had reached $128,069.42." (Doc. #96 at 9). The trial court found it appropriate to reduce this $128,069.42 figure "by $22,232.50, which Plaintiff's counsel acknowledged were for matters unrelated to the Sunshine Law claims." (*Id.*). Folkerth's uncontroverted testimony established however, that the $128,069.42 figure *already had been* reduced by $22,232.50 to account for the "acknowledged" unrelated claims. Therefore, the trial court should not have made a second reduction of $22,232.50. Maddox's third assignment of error on cross appeal will be sustained insofar as she challenges this reduction.

**{¶ 65}** We find no merit in Maddox's other fee-related arguments. She contends the trial court erred in making reductions of $12,103.25 and $8,611 on the basis that participation of two attorneys was not required. We believe the trial court acted within its discretion in making these reductions for time her two attorneys spent talking to one another or participating in conferences together. Finally, Maddox claims the trial court erred in reducing her attorney-fee award five percent, or $6,403.47, for no apparent reason. We disagree. The trial court stated that this reduction was "an additional adjustment for necessary and reasonable time spent[.]" When read in context, this reduction reasonably may be attributed to Maddox's counsel's block-billing practice. Earlier in its ruling, the trial court explained that "[d]ue to block billing practices, the court has had, at times, to estimate the reasonable time for certain tasks performed, since most entries contain multiple tasks." The five-percent reduction appears to be a product of the trial court's review of the block billing and its required estimation of the reasonable time spent. On the record before us, we cannot say the reduction was unreasonable.

{¶ 66} Based on the reasoning set forth above, CSB's second assignment of error is sustained in part and overruled in part. Maddox's third assignment of error on cross appeal likewise is sustained in part and overruled in part.

{¶ 67} The only remaining issue is Maddox's second assignment of error on cross appeal. There she challenges the trial court's back-pay award. As set forth above, the trial court found her June 26, 2012 termination invalid. It awarded her back pay up "to November 20, 2012, when the executive director position was extinguished by the merger of CSB with Greene County Job and Family Services." (Doc. #96 at 2).

{¶ 68} On appeal, Maddox contends the record is devoid of evidence that Greene County Children Services merged with Greene County Job and Family Services on November 20, 2012. Therefore, she argues that the trial court had no basis to terminate her back pay as of November 20, 2012. We disagree for at least two reasons.

{¶ 69} First, Maddox's own filings below acknowledged the merger. On April 29, 2013 she filed a motion to substitute the Greene County Board of Commissioners as a party defendant in place of CSB. In support, she stated: "* * * [I]t appears undisputed that the CSB no longer exists, the Board of Directors have ceased to hold office, and its interests have been transferred to the Greene County Department of Job and Family Services." (Doc. #83 at 1-2). In a separate memorandum filed that day, Maddox asserted that "the Board of Commissioners is *de jure* already a party in this action under Civ.R. 25, as a result of the merger." (Doc. #82 at 2). She also sought leave to file a second amended complaint alleging that CSB and the Commissioners had approved the merger and that the Commissioners had abolished four positions. (Doc. #76, Proposed Second Amended Complaint at ¶129-130).

{¶ 70} Second, the trial court could take judicial notice of the merger between Greene County Children Services and Greene County Job and Family Services. Judicial notice was proper because the merger was a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Evid.R. 201(B). Shortly after the merger vote, the Dayton Daily News published an article announcing that "Greene County commissioners unanimously voted Monday to merge the county children services agency with the jobs and family services department."[9] A "court may take judicial notice of legislative enactments." *Gahanna v. Jones-Williams*, 117 Ohio App.3d 399, 402, 690 N.E.2d 928, n.1 (10th Dist.1997). Therefore, the trial court was entitled to recognize the merger without evidence from the parties. As such, Maddox's former position and her right to further back pay was extinguished November 20, 2012. Maddox's second assignment of error on cross appeal is overruled.

{¶ 71} Based on the reasoning set forth above, the trial court's judgment is affirmed in part and reversed in part. Regarding the appeal by CSB, the judgment is reversed insofar as (1) the trial court erred in finding OMA violations based on CSB entering executive sessions to discuss threatened or imminent litigation and to discuss the dismissal or discipline of a public employee, (2) the trial court erred in imposing a $500 civil forfeiture for the "threatened or imminent litigation" executive session, and (3) the trial court erred in imposing five separate civil forfeitures, rather than just one, for executive sessions to discuss Maddox's "evaluation." Concerning Maddox's cross appeal, the judgment is reversed insofar as the trial court erred in reducing her attorney-fee award by $22,232.50 where that reduction already had been made. In all other respects, the trial court's judgment is affirmed. Finally, the cause is remanded for the

---

[9] www.daytondailynews.com/news/news/local/merger-of-greene-county-agencies-to-lead-to-job-cu/nS98Q

issuance of a final judgment consistent with this opinion.

**{¶ 72}** Judgment affirmed in part, reversed in part, and cause remanded.

. . . . . . . . . . . . .

DONOVAN and WELBAUM, JJ., concur.

Copies mailed to:

John R. Folkerth, Jr.
Paul M. Courtney
Lawrence E. Barbiere
Hon. John W. Kessler
(sitting for Judge Michael A. Buckwalter)